GOODING *v.* UNITED STATES

No. 72–6902.  Argued February 25, 1974—Decided April 29, 1974

REHNQUIST, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, WHITE, BLACKMUN, and POWELL, JJ., joined. DOUGLAS, J., filed a dissenting opinion, in which BRENNAN and MARSHALL, JJ., joined, *post*, p. 459. MARSHALL, J., filed a dissenting opinion, in which DOUGLAS and BRENNAN, JJ., joined, *post*, p. 461.

*Herbert A. Rosenthal,* by appointment of the Court, 414 U. S. 998, argued the cause and filed briefs for petitioner.

*Deputy Solicitor General Frey* argued the cause for the United States. With him on the brief were *Solicitor General Bork, Assistant Attorney General Petersen, Edward R. Korman,* and *Jerome M. Feit.*

MR. JUSTICE REHNQUIST delivered the opinion of the Court.

Petitioner in this case presents a claim that evidence offered against him at his trial should have been suppressed because it was seized at nighttime in violation of governing statutory provisions. The search which led to the seizure was conducted by officers of the District of Columbia Metropolitan Police Department at approximately 9:30 p. m. within the District of Columbia.

`Armed .with a search warrant, the officers entered peti-
tioner's apartment for the purpose of discovering viola-
tions of a federal narcotics statute, and seized a sub-
stantial amount of contraband narcotics. The parties
urge upon us differing theories concerning which federal
or District of Columbia statute bears on the legality of
this search, and we must therefore interpret and recon-
cile several recent congressional enactments dealing with
nighttime searches which seem to embody somewhat in-
consistent views.[1]

The Court of Appeals agreed with the District Court's
description of this congeries of statutes as a " 'bramble-
bush of uncertainties and contradictions,' "[2] and a mere
summary of the statutes attests to the accuracy of that
observation:

*District of Columbia Statutes:* The older of the two
conceivably relevant District of Columbia statutes, D. C.
Code § 33–414 (1973),[3] was enacted in 1956 and authorizes

---

[1] The Government contends that even though we were to deter-
mine that the applicable statutory provision was violated in this
case, the evidence should nonetheless not be suppressed. Since we
conclude that the seizure was consistent with the governing statute,
we have no occasion to reach this alternative argument.

[2] See 155 U. S. App. D. C. 259, 261, 477 F. 2d 428, 430 (1973),
quoting from 328 F. Supp. 1005, 1008 (DC 1971).

[3] "§ 33–414. Search warrants—Requirements—Form—Contents—
Return—Penalty for interfering with service.

"(a) A search warrant may be issued by any judge of the Superior
Court of the District of Columbia or by a United States commis-
sioner for the District of Columbia when any narcotic drugs are
manufactured, possessed, controlled, sold, prescribed, administered,
dispensed, or compounded, in violation of the provisions of this
chapter, and any such narcotic drugs and any other property
designed for use in connection with such unlawful manufacturing,
possession, controlling, selling, prescribing, administering, dispensing,
or compounding, may be seized thereunder, and shall be subject to
such disposition as the court may make thereof and such narcotic

search warrants for violations of the District of Columbia narcotics laws. This section does not limit the time during which searches may be made; stating plainly that "[t]he judge or commissioner shall insert a direction in the warrant that it may be served at any time in the day or night." This liberal time provision is in direct contrast to the more restrictive provisions of the second

---

drugs may be taken on the warrant from any house or other place in which they are concealed.

"(b) A search warrant cannot be issued but upon probable cause supported by affidavit particularly describing the property and the place to be searched.

"(c) The judge or commissioner must, before issuing the warrant, examine on oath the complainant and any witnesses he may produce, and require their affidavits or take their depositions in writing and cause them to be subscribed by the parties making them.

"(d) The affidavits or depositions must set forth the facts tending to establish the grounds of the application or probable cause for believing that they exist.

"(e) If the judge or commissioner is thereupon satisfied of the existence of the grounds of the application or that there is probable cause to believe their existence, he must issue a search warrant, signed by him, to the major and superintendent of police of the District of Columbia or any member of the Metropolitan police department, stating the particular grounds or probable cause for its issue and the names of the persons whose affidavits have been taken in support thereof, and commanding him forthwith to search the place named for the property specified and to bring it before the judge or commissioner.

"(f) A search warrant may in all cases be served by any of the officers mentioned in its direction, but by no other person, except in aid of the officer on his requiring it, he being present and acting in its execution.

"(g) The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute the warrant, if, after notice of his authority and purpose, he is refused admittance.

"(h) The judge or commissioner shall insert a direction in the warrant that it may be served at any time in the day or night."

District of Columbia statute to be considered, D. C. Code § 23–521 (f)(5),[4] which specifically requires that search warrants be served in the daytime unless certain con-

[4] "§ 23–521.  Nature and issuance of search warrants

"(a) Under circumstances described in this subchapter, a judicial officer may issue a search warrant upon application of a law enforcement officer or prosecutor.  A warrant may authorize a search to be conducted anywhere in the District of Columbia and may be executed pursuant to its terms.

"(b) A search warrant may direc  a search of any or all of the following:
"(1) one or more designated or aescribed places or premises;
"(2) one or more designated or described vehicles;
"(3) one or more designated or described physical objects; or
"(4) designated persons.

"(c) A search warrant may direct the seizure of designated property or kinds of property, and the seizure may include, to such extent as is reasonable under all the circumstances, taking physical or other impressions, or performing chemical, scientific, or other tests or experiments of, from, or upon designated premises, vehicles, or objects.

"(d) Property is subject to seizure pursuant to a search warrant if there is probable cause to believe that it—
"(1) is stolen or embezzled;
"(2) is contraband or otherwise illegally possessed;
"(3) has been used or is possessed for the purpose of being used, or is designed or intended to be used, to commit or conceal the commission of a criminal offense; or
"(4) constitutes evidence of or tends to demonstrate the commission of an offense or the identity of a person participating in the commission of an offense.

"(e) A search warrant may be addressed to a specific law enforcement officer or to any classification of officers of the Metropolitan Police Department of the District of Columbia or other agency authorized to make arrests or execute process in the District of Columbia.

"(f) A search warrant shall contain—
"(1) the name of the issuing court, the name and signature of the issuing judicial officer, and the date of issuance;
"(2) if the warrant is addressed to a specific officer, the name of .

ditions set forth in § 23–522 (c)(1) are met. These conditions essentially require a showing of special need to search at night, and concededly have not been satisfied in this case.

---

that officer, otherwise, the classifications of officers to whom the warrant is addressed;

"(3) a designation of the premises, vehicles, objects, or persons to be searched, sufficient for certainty of identification;

"(4) a description of the property whose seizure is the object of the warrant;

"(5) a direction that the warrant be executed during the hours of daylight or, where the judicial officer has found cause therefor, including one of the grounds set forth in section 23–522 (c)(1), an authorization for execution at any time of day or night;

"(6) where the judicial officer has found cause therefor, including one of the grounds set forth in subparagraph (A), (B), or (D) of section 23–591 (c)(2), an authorization that the executing officer may break and enter the dwelling house or other building or vehicles to be searched without giving notice of his identity and purpose; and

"(7) a direction that the warrant and an inventory of any property seized pursuant thereto be returned to the court on the next court day after its execution.

"§ 23–522. Applications for search warrants

"(a) Each application for a search warrant shall be made in writing upon oath or affirmation to a judicial officer.

"(b) Each application shall include—

"(1) the name and title of the applicant;

"(2) a statement that there is probable cause to believe that property of a kind or character described in section 23–521 (d) is likely to be found in a designated premise, in a designated vehicle or subject, or upon designated persons;

"(3) allegations of fact supporting such statement; and

"(4) a request that the judicial officer issue a search warrant directing a search for and seizure of the property in question.

"The applicant may also submit depositions or affidavits of other persons containing allegations of fact supporting or tending to support those contained in the application.

"(c) The application may also contain—

"(1) a request that the search warrant be made executable at any hour of the day or night, upon the ground that there is probable

436

*Federal Statutes and Rules:* The general provision governing federal search warrants is found in Fed. Rule Crim. Proc. 41.[5]    At the time the search in this case

cause to believe that (A) it cannot be executed during the hours of daylight, (B) the property sought is likely to be removed or destroyed if not seized forthwith, or (C) the property sought is not likely to be found except at certain times or in certain circumstances; and

"(2) a request that the search warrant authorize the executing officer to break and enter dwelling houses or other buildings or vehicles to be searched without giving notice of his identity and purpose, upon probable cause to believe that one of the conditions set forth in subparagraph (A), (B), or (D) of section 23–591 (c) (2) is likely to exist at the time and place at which such warrant is to be executed.

"Any request made pursuant to this subsection must be accompanied and supported by allegations of fact supporting such request."

[5] At the time of the search in this case Rule 41 read, in part, as follows:

"Search and Seizure

"(a) Authority to Issue Warrant. A search warrant authorized by this rule may be issued by a judge of the United States or of a state, commonwealth or territorial court of record or by a United States commissioner within the district wherein the property sought is located.

"(b) Grounds for Issuance. A warrant may be issued under this rule to search for and seize any property

"(1) Stolen or embezzled in violation of the laws of the United States; or

"(2) Designed or intended for use or which is or has been used as the means of committing a criminal offense; or

"(3) Possessed, controlled, or designed or intended for use or which is or has been used in violation of Title 18, U. S. C., § 957.

"(c) Issuance and contents. A warrant shall issue only on affidavit sworn to before the judge or commissioner and establishing the grounds for issuing the warrant. If the judge or commissioner is satisfied that grounds for the application exist or that there is probable cause to believe that they exist, he shall issue a warrant identifying the property and naming or describing the person or place to be searched. The warrant shall be directed to a civil officer

took place, Rule 41 (c) provided that warrants must be served in the daytime except where "the affidavits are positive that the property is on the person or in the place to be searched." [6]  In such event the war-

of the United States authorized to enforce or assist in enforcing any law thereof or to a person so authorized by the President of the United States. It shall state the grounds or probable cause for its issuance and the names of the persons whose affidavits have been taken in support thereof. It shall command the officer to search forthwith the person or place named for the property specified. The warrant shall direct that it be served in the daytime, but if the affidavits are positive that the property is on the person or in the place to be searched, the warrant may direct that it be served at any time. It shall designate the district judge or the commissioner to whom it shall be returned.

"(g) Scope and Definition. This rule does not modify any act, inconsistent with it, regulating search, seizure and the issuance and execution of search warrants in circumstances for which special provision is made. The term 'property' is used in this rule to include documents, books, papers and any other tangible objects."

[6] Rule 41 has since been amended to read, in part:

"(a) Authority to issue warrant. A search warrant authorized by this rule may be issued by a federal magistrate or a judge of a state within the district wherein the property sought is located, upon request of a federal law enforcement officer or an attorney for the government.

"(b) Property which may be seized with a warrant. A warrant may be issued under this rule to search for and seize any (1) property that constitutes evidence of the commission of a criminal offense; or (2) contraband, the fruits of crime, or things otherwise criminally possessed; or (3) property designed or intended for use or which is or has been used as the means of committing a criminal offense.

"(c) Issuance and contents. A warrant shall issue only on an affidavit or affidavits sworn to before the federal magistrate or state judge and establishing the grounds for issuing the warrant. If the federal magistrate or state judge is satisfied that grounds for the application exist or that there is probable cause to believe that they exist, he shall issue a warrant identifying the property and

rant could direct "that it be served at any time." This provision was incorporated in the Rules in 1948 as a replacement for language previously contained in the Espionage Act of 1917.[7] A second federal statute relating only to searches for "controlled substances" is found in 21 U. S. C. § 879 (a),[8] which was enacted in

naming or describing the person or place to be searched. The finding of probable cause may be based upon hearsay evidence in whole or in part. Before ruling on a request for a warrant the federal magistrate or state judge may require the affiant to appear personally and may examine under oath the affiant and any witnesses he may produce, provided that such proceeding shall be taken down by a court reporter or recording equipment and made part of the affidavit. The warrant shall be directed to a civil officer of the United States authorized to enforce or assist in enforcing any law thereof or to a person so authorized by the President of the United States. It shall command the officer to search, within a specified period of time not to exceed 10 days, the person or place named for the property specified. The warrant shall be served in the daytime, unless the issuing authority, by appropriate provision in the warrant, and for reasonable cause shown, authorizes its execution at times other than daytime. It shall designate a federal magistrate to whom it shall be returned.

.          .          .          .          .

"(h) Scope and definition. This rule does not modify any act, inconsistent with it, regulating search, seizure and the issuance and execution of search warrants in circumstances for which special provision is made. The term 'property' is used in this rule to include documents, books, papers and any other tangible objects. The term 'daytime' is used in this rule to mean the hours from 6:00 a. m. to 10:00 p. m. according to local time. The phrase 'federal law enforcement officer' is used in this rule to mean any government agent, other than an attorney for the government as defined in Rule 54 (c), who is engaged in the enforcement of the criminal laws and is within any category of officers authorized by the Attorney General to request the issuance of a search warrant."

[7] § 10, 40 Stat. 229.

[8] "21 U. S. C. § 879. Search warrants.

"(a) A search warrant relating to offenses involving controlled substances may be served at any time of the day or night if the

1970. That section provides that a warrant may be served "at any time of the day or night" so long as the issuing authority "is satisfied that there is probable cause to believe that grounds exist for the warrant and for its service at such time." This provision in turn is the successor to a provision in 18 U. S. C. § 1405 (1964 ed.),[9] enacted in 1956 to relax the "positivity" test of Rule 41 in cases involving certain narcotic drugs.[10] Congress had passed this statute in response to the complaints of law enforcement officers that the positivity requirement gave commercial narcotics dealers a definite advantage over federal agents. Rule 41 is therefore not applicable to searches governed by the more specific narcotic search statutes.[11]

judge or United States magistrate issuing the warrant is satisfied that there is probable cause to believe that grounds exist for the warrant and for its service at such time."

[9] "§ 1405. Issuance of search warrants—procedure.

"In any case involving a violation of any provision of part I or part II of subchapter A of chapter 39 of the Internal Revenue Code of 1954 the penalty for which is provided in subsection (a) or (b) of section 7237 of such Code, a violation of subsection (c), (h), or (i) of section 2 of the Narcotic Drugs Import and Export Act, as amended (21 U. S. C., sec. 174), or a violation of the Act of July 11, 1941, as amended (21 U. S. C., sec. 184a)—

"(1) a search warrant may be served at any time of the day or night if the judge or the United States Commissioner issuing the warrant is satisfied that there is probable cause to believe that the grounds for the application exist, and

"(2) a search warrant may be directed to any officer of the Metropolitan Police of the District of Columbia authorized to enforce or assist in enforcing a violation of any of such provisions."

[10] See, e. g., H. R. Rep. No. 2546, 84th Cong., 2d Sess., 16 (1956).

[11] See, e. g., United States v. Stallings, 413 F. 2d 200 (CA7), cert. denied, 396 U. S. 972 (1969); United States v. Castle, 213 F. Supp. 52 (DC 1962).

Our Brother MARSHALL in his dissenting opinion stresses Congress' continuing concern for individual privacy, as demonstrated by the

The facts of this case must be understood in the context of these statutes. On February 11, 1971, an Assistant United States Attorney applied to a United States Magistrate sitting in the District of Columbia for a warrant authorizing a search of petitioner's apartment for evidence of illegal narcotics. The application included the brief notation: "Violation: U. S. C.; Title 26. Sections: 4704a." In connection with the application, an officer of the Metropolitan Police Department vice squad appeared before the Magistrate and swore that he had reason to believe petitioner was concealing property held in violation of that same code provision.[12]

---

limitations on nighttime searches contained in the Espionage Act, *supra*, and later, Fed. Rule Crim. Proc 41. The implication seems to be that this concern must be read into the provisions of 21 U. S. C. § 879 (a) to reach the interpretation for which he argues. But this argument totally ignores the fact that Congress, in 1956, enacted a statute governing searches for dangerous drugs which deliberately removed the stricter limitations on night searches found in Rule 41. Our construction of the principal statute considered in this case, 21 U. S. C. § 879 (a), therefore, represents no novel departure from previous congressional policy in this area, but is, on the contrary, consistent with the conceded meaning of the statute which governed federal drug searches for almost 15 years.

[12] The affidavit read in full:

"BEFORE Lawrence S. Margolis, Wash., D. C. The undersigned being duly sworn deposes and says:

"That he (has reason to believe) that (on the premises known as) 1419 Chapin Street, N. W., as you enter the building last apartment on the right next to the elevator on the first floor Washington in the District of Columbia there is now being concealed certain property, namely heroin, syringes, tourniquets, cookers and paraphernalia used in the preparation of heroin for retail and any other paraphernalia used in the preparation and dispensation of heroin and any other narcotic drugs illegally held, which are in violation of Title 26 U. S Code Section 4704 (a).

"And that the facts tending to establish the foregoing ground

The officer supplemented his personal testimony with a written affidavit, outlining the basis for the application in more detail and alleging specifically that "illegal drugs are sold and possessed in violation of the United States Code, Title 26, Section 4704a." [13] The affidavit concluded with the language: "I am positive that Lonnie Gooding is secreting narcotics inside his apartment at 1419 Chapin Street NW in violation of the US Code."

The Magistrate then issued a warrant directing the Chief of Police or "any member of MPDC" to search petitioner's apartment. [14] The warrant specifically noted

for issuance of a Search Warrant are as follows: See the facts set forth in the affidavit attached hereto and made a part hereof.

/s/ Marion L. Green

MARION L. GREEN

MPD"

[13] The affidavit states specifically:

"I, the undersigned officer who is assigned to the Third District Vice Squad, Metropolitan Police Department, and working in the City of Washington, D. C. in an undercover capacity where illegal drugs are sold and possessed in violation of the United States Code, Title 26, Section 4704a. Had the occasion to investigate the following offense."

[14] The warrant read in its entirety:

"To Chief of Police or any Member of MPDC

"Affidavit having been made before me by Plc. Marrion [*sic*] L. Green, Jr. Third District Vice Squad that he (has reason to believe) that (on the premises known as) 1419 Chapin Street, N. W., as you enter the building last apartment on the right next to the elevator on the first floor, Washington in the District of Columbia, there is now being concealed certain property, namely heroin, capsules, envelopes, syringes, tourniquets, cookers and paraphernalia used in the preparation of heroin for distribution or use and any other instrumentalities or evidence of illegal possession or dispensation of heroin or of any other narcotic drugs illegally held. See the facts set forth in the affidavit attached hereto and made a part hereof which are in violation of Title 26 Section 4704 (a) of the U. S. Code, and as I am satisfied that there is probable cause to believe that the property so described is being concealed on the (premises) above

that facts had been set forth in an affidavit alleging a violation of 26 U. S. C. § 4704 (a) (1964 ed.) and that those facts established probable cause to make the search. The warrant also stated that the search could be made "at any time in the day or night." This phrase was accompanied by a footnote reference to Fed. Rule Crim. Proc. 41 (c), presumably because the police officer had asserted he was "positive" the drugs were in petitioner's apartment. One of the briefs filed in this case suggests that the warrant form was preprinted and contemplated application of Rule 41 standards.[15]

The search warrant was executed on February 12, 1971, at 9:30 p. m.[16] The officers engaged in the search were

---

described and that the foregoing grounds for application for issuance of the search warrant exist.

"*You are hereby commanded* to search forthwith the (place) named for the property specified, serving this warrant and making the search (at any time in the day or night[*]) and if the property be found there to seize it, leaving a copy of this warrant and a receipt for the property taken, and prepare a written inventory of the property seized and return this warrant and bring the property before me within ten days of this date, as required by law.

"Dated this day of Feb. 11, 1971

/s/ Lawrence S. Margolis
U. S. Commissioner"

"[*]The Federal Rules of Criminal Procedure provide: 'The warrant shall direct that it be served in the daytime, but if the affidavits are positive that the property is on the person or in the place to be searched, the warrant may direct that it be served at any time.' (Rule 41C)."

[15] Reply Brief for Petitioner 8.

[16] The Government contends in its brief, apparently for the first time in the course of this litigation, that the search was not in fact a nighttime search. The primary basis for this argument is revised Fed. Rule Crim. Proc. 41 which states that "[t]he term 'daytime' is used in this rule to mean the hours from 6:00 a. m. to 10:00 p. m. according to local time." See n. 6, *supra*. In view of our conclusion

all members· of the District of Columbia Metropolitan Police Department, and ·the search uncovered a substantial quantity of contraband narcotic materials. They were seized and formed the basis for charging petitioner with violations of 26 U. S. C. § 4704 (a) (1964 ed.) [17] and 21 U. S. C. § 174 (1964 ed.).[18]   Following his indictment in· the United States District Court for the District of Columbia on April 6, 1971, petitioner filed a·.motion to suppress the evidence discovered in the February 12 search.

·. Several grounds were asserted in support of the motion, particularly that "[t]he search warrant was executed at night but the application for the warrant did not comply with the D. C. Code provisions for nighttime search

---

that the standards for a nighttime as well as a daytime search under 21 U. S. C. § 879 (a) were met in this case, we do not need to resolve this issue.

[17] "§ 4704. Packages.

"(a) General requirement.

"It shall be unlawful for any person to purchase, sell, dispense, or distribute narcotic drugs except in the original stamped package or from the original stamped package; and the absence of appropriate taxpaid stamps from narcotic drugs shall be prima facie evidence of a violation of this subsection by the person in ·whose possession the same may be found."

[18] "§ 174. Same; penalty; evidence.

"Whoever fraudulently or knowingly imports.or brings any narcotic drug into the United States or any territory under its control or jurisdiction, contrary to law, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of any such narcotic drug after being imported or brought in, knowing the same to have been imported or brought into the United States contrary to law, or conspires to commit any of such acts in violation of the laws of the United States, shall be imprisoned not less than five or more than twenty years ·and, in addition, may be fined not more than $20,000.   For a second or subsequent offense (as determined under section 7237 (c) of the Internal Revenue Code of 1954), the offender shall be imprisoned not less than ten or more than forty years and, in addition, may be fined not more than $20,000."

warrants . . . ."[19] Although no provisions of the D. C. Code were explicitly referred to, petitioner's argument apparently was that Title 23 of the D. C. Code, requiring that a special showing of need be made to justify a search at night, governed this search, and that its requirements had not been met. The District Court found this reasoning persuasive and granted the motion to suppress. Rejecting the Government's argument that the warrant was not issued under Title 23 but rather under 21 U. S. C. § 879 (a), the court stated:

> "Whatever be the standards generally for issuance of a nighttime search warrant in federal narcotics cases in other parts of the country, however, the Court finds that the existence of 21 U. S. C. § 879 (a) does not remove such cases from the explicit requirements for search warrants in the District of Columbia under the newly enacted Title 23, D. C. Code."[20]

Having decided that District of Columbia law applied, the District Court admitted to some uncertainty about the status of D. C. Code § 33–414, the provision dealing specifically with violations of local drug laws. The court noted with some puzzlement that no mention of this provision was found in the legislative history of Title 23, and that some language in the legislative history suggested that the provision had simply been overlooked.[21] Nevertheless, the court determined that

> "[p]ending prompt review of this determination

---

[19] Petitioner also contended that the officers entered the apartment without knocking and without having a "no-knock" warrant and that the police had no probable cause to search him. Neither court below passed upon the sufficiency of these contentions, and they are not before us here.

[20] 328 F. Supp., at 1007.

[21] *Id.*, at 1008 n. 1.

> or congressional action, and pending interpretation of 33 D. C. Code § 414 (h) in light of the new Title 23 provisions, search warrants which are to be executed in the nighttime should comply in all respects with 23 D. C. Code § 523 (b)." [22]

Concededly the warrant issued in this case did not comply with the requirements of Title 23.

The Court of Appeals for the District of Columbia Circuit reversed the District Court,[23] although none of the three judges who composed the panel completely agreed with any other on the proper rationale. All three agreed, however, that 21 U. S. C. § 879 (a), rather than any provision of the District of Columbia Code, was the provision which determined the legality of this search. All three likewise agreed that the affidavit submitted by the District of Columbia police officer satisfied the requirements of that section. Judge Wilkey and Judge Fahy found that no greater showing for a nighttime search was required by § 879 (a) than was required by its predecessor statute governing federal narcotics searches, 18 U. S. C. § 1405 (1964 ed.), and that the affidavit need establish only probable cause to believe that the property would be on the premises at the time of the search.[24] Judge Robinson believed that § 879 (a)

---

[22] *Id.,* at 1008.

[23] 155 U. S. App. D. C. 259, 477 F. 2d 428 (1973).

[24] Judge Wilkey stated in his opinion: "We hold that the applicable statute, 21 U. S. C. § 879 (a), requires only a showing of probable cause to believe that the narcotics will be found on the premises at any time of the day or night." *Id.,* at 266, 477 F. 2d, at 435. Judge Fahy in his opinion stated: "Thus, in the case of narcotics, previously under Section 1405 (1) and later under Section 879 (a), if the judge was satisfied 'that there is probable cause to believe' rather than 'if the affidavits are positive' that the 'property is on the person or in the place to be searched,' the warrant could permit execution at any time." *Id.,* at 268, 477 F. 2d, at 437.

did require an additional showing for a nighttime search, but concluded that such a showing had been made in this case.[25]

Petitioner urges that we reverse the Court of Appeals on either or both of two alternative grounds. First, petitioner repeats his assertion, sustained by the District Court, that Title 23 of the D. C. Code is the statute applicable to the search in this case and that, as the Government has conceded, the requirements of that title have not been satisfied. Second, petitioner argues that, if 21 U. S. C. § 879 (a) is considered to be the applicable provision, a special showing for nighttime searches must be made. We agree with the Court of Appeals that 21 U. S. C. § 879 (a) is the statute applicable to this case, and that its provisions have been satisfied here.[26]

I

The unique situation of the District of Columbia, for which Congress legislates both specially and as a part

---

[25] Judge Robinson concluded: "The test of reasonable cause for nighttime execution does not demand a demonstration that drugs are positively on the premises at night, or that they could be found on the premises only at night, or that for some reason a search would be impossible in the daytime. It does summon some factual basis for a prudent conclusion that the greater intrusiveness of nighttime execution of the warrant is justified by the exigencies of the situation." Id., at 274, 477 F. 2d, at 443. Judge Robinson then went on to find that a proper showing had been made in this case. He stated: "Where, as here, it appears that a search is calculated not only to garner evidence of past crime but also to terminate a serious species of ongoing criminality, reasonable cause for a nocturnal intrusion is demonstrated." Id., at 275, 477 F. 2d, at 444.

[26] We are therefore not required to reach the Government's argument that, despite the fact that the application for the search warrant alleged a violation of the United States Code, the search could be justified under D. C. Code § 33–414 as a search for violations of local drug laws.

of the Nation, gives rise to the principal difficulties in this case. For we deal here not with statutory schemes enacted by independent legislative bodies, but with possibly overlapping schemes enacted by a single body. Despite the potential overlap, however, we think that the operative facts surrounding this search strongly indicate that the standards for issuance of a warrant should be governed by the nationwide federal legislation enacted by Congress—that is, 21 U. S. C. § 879 (a) [27]— rather than by the local D. C. laws. To begin with, an Assistant United States Attorney, who had discretion to proceed either under federal or under local law, filed the application for the search warrant alleging a violation of the United States Code. Application was made to a United States Magistrate, located in the United States District Court building, and neither the application nor the supporting affidavits contained any mention of the local narcotics laws. After the materials were seized, petitioner was indicted for violations of federal law.

Petitioner contends, however, that Title 23 of the D. C. Code should apply to this case because the executing officers, as well as the officer swearing to the affidavit presented to the Magistrate, were not federal officers but officers of the District of Columbia Metropolitan Police Department. He argues that the provisions of 21 U. S. C. § 879 (a) were intended to apply solely to agents of the Bureau of Narcotics and Dangerous Drugs, none of whom were involved here, whereas Title 23 of the D. C. Code was intended to provide comprehensive regulation of District of Columbia police officers investigating both local and federal offenses. Petitioner reinforces his argument by noting that the former federal statute

---

[27] The provisions of 21 U. S. C. § 879 (a) prevail over the provisions of Fed. Rule Crim. Proc. 41 when controlled substances are involved. See nn. 10 and 11, *supra*.

regulating drug searches specifically provided that "a search warrant may be directed to any officer of the Metropolitan Police of the District of Columbia authorized to enforce or assist in enforcing a violation of any of such provisions," [28] while no such section appears in 21 U. S. C. § 879. Therefore, says petitioner, the District of Columbia police were no longer to be considered federal agents for the purpose of enforcing federal drug laws.

Although petitioner's arguments cannot be dismissed lightly, we find them ultimately unpersuasive. Concededly there are hints in the statutory framework and legislative history of the Controlled Substances Act, 84 Stat. 1242, that indicate the policing function under those provisions would be the primary responsibility of the Bureau of Narcotics and Dangerous Drugs.[29] But this focus on the Bureau's role seems entirely natural in view of one of the Act's stated purposes to "collect the diverse drug

---

[28] See n. 9, *supra*.

[29] For example, John Ingersoll, Director of the Bureau of Narcotics and Dangerous Drugs, stated at the Hearings on Drug Abuse Control Amendments—1970 before the Subcommittee on Public Health and Welfare of the House Committee on Interstate and Foreign Commerce, 91st Cong., 2d Sess., ser. 91–45, pt. 1, p. 86 (1970), that the no-knock provision, incorporated in § 702 (b) of the proposed bill, see n. 32, *infra*, would grant authority "restricted to special agents of the Bureau of Narcotics and Dangerous Drugs." In addition, the preceding provision of the bill set forth expanded powers for the agents of the BNDD. However, although these excerpts would argue for petitioner's position here, we believe that the Government's position ultimately proves to be stronger. We believe for the reasons stated in the text that the emphasis on the powers of the BNDD agents was not intended to remove powers from other federal agents who had previously assisted in the enforcement of federal drug laws. See also 18 U. S. C. §§ 3052, 3053, and 3056, setting forth arrest powers for agents of the Federal Bureau of Investigation, United States marshals, and Secret Service agents.

control and enforcement laws under one piece of legislation to facilitate law enforcement, drug research, educational and related control facilities." [30]   In providing a comprehensive federal scheme for the control of drug abuse, Congress could be expected to pay special attention to the federal agency set up to enforce the laws. But this attention does not mean that Congress at the same time wished to dispense with the aid of other enforcement personnel who had previously given assistance.

The failure of Congress to include a special provision authorizing District of Columbia police officers to obtain search warrants for investigating federal offenses cannot be taken as a deliberate exclusion in view of the overall statutory framework.   The provision included in the previous federal statute may well have seemed unnecessary, both in light of the history of cooperation between the District of Columbia police and federal officers and in view of the provisions of D. C. Code § 4–138 providing that "[a]ny warrant for search or arrest, issued by any magistrate of the District, may be executed in any part of the District by any member of the police force . . . ." [31] Thus, both custom and statute already assured the availability of District of Columbia police.   Furthermore, the legislative history relating to § 879 (a) stresses the need for stronger enforcement of the federal narcotics laws, a goal hardly advanced by reducing the forces available to execute those laws.   In fact, the provision

[30] S. Rep. No. 91–613, p. 3 (1969).

[31] D. C. Code § 4–138 provides:

"Any warrant for search or arrest, issued by any magistrate of the District, may be executed in any part of the District by any member of the police force, without any backing or indorsement of the warrant, and according to the terms thereof; and all provisions of law in relation to bail in the District shall apply to this chapter." See *Thomas* v. *United States,* 409 U. S. 992, 993 (1973) (DOUGLAS, J., dissenting).

which is now § 879 (b), permitting "no-knock" searches under certain conditions, was one of the most controversial sections of the entire bill, and was defended primarily by the pressing need for added enforcement weapons to combat the increased drug traffic.[32]

Finally, the interpretation urged by petitioner would leave District of Columbia officers able to execute general federal search warrants under amended Fed. Rule Crim. Proc. 41, but would deny them that authority under the federal drug search statute. Rule 41 now provides that "a federal law enforcement officer"—defined in the Rule to include "any category of officers authorized by the Attorney General to request the issuance of a search warrant"—may make applications under the Rule. The Attorney General has since listed the Metropolitan Police Department among those agencies

---

[32] "§ 879. Search warrants.

"(b) Any officer authorized to execute a search warrant relating to offenses involving controlled substances the penalty for which is imprisonment for more than one year may, without notice of his authority and purpose, break open an outer or inner door or window of a building, or any part of the building, or anything therein, if the judge or United States magistrate issuing the warrant (1) is satisfied that there is probable cause to believe that (A) the property sought may and, if such notice is given, will be easily and quickly destroyed or disposed of, or (B) the giving of such notice will immediately endanger the life or safety of the executing officer or another person, and (2) has included in the warrant a direction that the officer executing it shall not be required to give such notice. Any officer acting under such warrant, shall, as soon as practicable after entering the premises, identify himself and give the reasons and authority for his entrance upon the premises."

See H. R. Rep. No. 91-1444, p. 25 (1970), which stated:

"The purpose of this provision [the no-knock provision], as explained in the hearings, is to provide law enforcement officials with a tool to aid in combatting the illicit traffic in drugs which has proved helpful in all of the 29 States where this authority exists either by statute or common law."

which are so authorized.[33] If petitioner's contention were accepted, it would seemingly mean that the general search warrant statute applicable to the District of Columbia would govern District of Columbia police officers investigating federal drug cases, but would not govern them when investigating other federal crimes. This result would obtain despite the fact that District of Columbia police officers historically played a prominent role in the enforcement of federal drug laws under 18 U. S. C. § 1405 (1964 ed.).

There is little indication that Title 23 of the D. C. Code was intended to serve the sweeping purpose which petitioner attributes to it.[34] The search warrant provisions upon which petitioner relies were part of the Court Reform and Criminal Procedure Act, which substantially reorganized the District of Columbia court system, providing for a new local court of general jurisdiction and relieving the United States District Court for the District of Columbia of much of its local burden.[35] Prior to that time all local felonies had been tried in the United States District Court, and the Federal Rules of Criminal Procedure by their terms had applied. The creation of the new Superior Court created the need for a new set of pro-

---

[33] See Atty. Gen. Order 510–73, 38 Fed. Reg. 7244–7245.

[34] The effect of Title 23 on other statutes was debated in some detail below. Judge Wilkey in his opinion noted that the provisions of 21 U. S. C. § 879 (a) were not only enacted after the provisions of Title 23 (although they took effect sooner), but also are more specific in terms of subject matter, i. e., drug control. 155 U. S. App. D. C., at 262, 477 F. 2d, at 431. Thus, as a matter of statutory construction, it is somewhat difficult to see how Title 23 was intended to modify any later, more specific statute. Petitioner no longer suggests that Title 23 must be read into the provisions of 21 U. S. C. § 879 (a). He contends either that Title 23 is applicable in its entirety or that § 879 (a) by its own terms requires a special showing for searches at night.

[35] D. C. Code § 11–901.

cedural rules, and, though some important changes were made, the new rules quite closely tracked the Federal Rules. It does not seem unreasonable, therefore, to suggest that the general provision relating to search warrants, found in D. C. Code § 23–521 *et seq.* and then incorporated in similar form into the rules [36] promulgated

[36] "Rule 41. Search and Seizure.

"(a) Authority to Issue Warrant. A search warrant authorized by this rule may be issued by a judge of the Superior Court.

"(b) Grounds for Issuance. A warrant may be issued under this rule to search for and seize property. Property is subject to seizure pursuant to a search warrant if there is probable cause to believe that it (1) is stolen or embezzled; or (2) is contraband or otherwise illegally possessed; or (3) has been used or is possessed for the purpose of being used, or is designed or intended to be used, to commit or conceal the commission of an offense; or (4) constitutes evidence of or tends to demonstrate the commission of an offense or the identity of a person participating in the commission of an offense.

"(c) Application for Search Warrants. Each application for a search warrant shall be made in writing upon oath to a judge of the Superior Court. Each application shall include the name and title of the applicant; a statement that there is probable cause to believe that property described in paragraph (b) as subject to seizure is likely to be found in a designated premise, in a designated vehicle or object, or upon designated persons; allegations of fact supporting such statement; and a request that the judge issue a search warrant directing a search for and seizure of the property in question. The applicant may also submit depositions or affidavits of other persons containing allegations of fact supporting or tending to support those contained in the application.

"The application may also contain (1) a request that the search warrant be made executable at any hour of the day or night, upon the ground that (i) there is probable cause to believe that it cannot be executed during the hours of daylight, or (ii) the property sought is likely to be removed or destroyed if not seized forthwith, or (iii) the property sought is not likely to be found except at certain times or in certain circumstances; and (2) a request approved by an appropriate prosecutor that the search warrant authorize the executing officer to break and enter dwelling houses or other buildings

Feb. 1, 1971, for the new Superior Court, was intended to be a counterpart to Fed. Rule Crim. Proc. 41. The Federal Rule, as discussed *infra*, did not apply to narcotics cases in the federal courts since more specific provisions, first those of 18 U. S. C. § 1405 (1964 ed.) and then those of 21 U. S. C. § 879 (a), controlled.[37]

This conclusion is reinforced by the fact that Federal Rule 41 has been subsequently modified to more closely resemble the District of Columbia statute and rule. The new Federal Rule, though less specific than the local rule, provides that a search warrant must be served in the daytime, "unless the issuing authority, by appropriate provision in the warrant, and for reasonable cause shown, authorizes its execution at times other than daytime," and abandons the old, cumbersome positivity standard. The concern for individual privacy revealed in the provisions of the District of Columbia search statute may thus be found in the new Federal Rule as well, but Congress, as it had in the earlier version of the Rule,

or vehicles to be searched without giving notice of his identity and purpose, upon probable cause to believe that one of the conditions listed in subparagraphs (a), (b), or (d) of D. C. Code § 23–591 (c) (2) is likely to exist at the time and place at which such warrant is to be executed whereby the applicant may dispense with such requirement. Any request that a search warrant be executable at any time of the day or night or that a search warrant authorize the executing officer to break and enter without a prior announcement of his identity and purpose must be accompanied and supported by allegations of fact supporting such request." Effective Oct. 25, 1973, paragraph (b) of this rule was amended. Paragraphs (a) and (c) were unchanged.

[37] We note that the District of Columbia Court of Appeals has indicated that the specific provisions of Title 33 are not qualified by the more general provisions of Title 23 in searches for violations of the local drug laws in the District of Columbia. See *United States* v. *Thomas*, 294 A. 2d 164, 167–168, cert. denied, 409 U. S. 992 (1973).

nevertheless showed its clear intention to leave intact other special search warrant provisions, including, of course, the provisions relating to searches for controlled substances.[38] In those limited cases Congress has considered the need for privacy to be counterbalanced by the public need for more effective law enforcement. We do not believe that Congress, by enacting a general search warrant provision for the District of Columbia, has struck a different balance in federal drug cases simply because District of Columbia police officers are involved.

We therefore conclude, as did all the judges of the Court of Appeals, that the statute applicable to this case is 21 U. S. C. § 879 (a). Our remaining task is to determine whether the requirements of that section have been met.

## II

."A search warrant relating to offenses involving controlled substances may be served at any time of the day or night if the judge or United States magistrate issuing the warrant is satisfied that there is probable cause to believe that grounds exist for the warrant and for its service at such time." 21 U. S. C. § 879 (a).

Only the last seven words of the statute are really in controversy here. Petitioner contends that this language, not found in the predecessor statute, 18 U. S. C. § 1405 (1964 ed.), was intended to require some special showing of need for searches conducted at night rather than during the day. His contention was adopted, at least in part, by Judge Robinson in the Court of Appeals. The Government, on the other hand, contends that it must show only probable cause to believe that the

---

[38] See Fed. Rule Crim. Proc. 41 (h), *supra*, n. 6. See also subsection (g) of prior Rule 41, n. 5, *supra*.

sought-after property will be on the premises at the time of the search, and that if there is probable cause to believe the property will be on the premises at night, such a showing sufficiently meets the requirement imposed by the last seven words of § 879 (a).

The language of the statute by itself is not crystal clear on this issue. Petitioner insists that the last phrase requires with unmistakable clarity a separate finding of probable cause to justify a nighttime search. Thus, according to petitioner, the issuing magistrate would have to satisfy himself that there was not only probable cause for the search, but also probable cause for believing that the search should be conducted at nighttime rather than during the daytime. While this is *a* possible meaning, it is by no means the only possible meaning attributable to the words.

Petitioner's interpretation really assumes that the statute reads: "There is probable cause to believe that grounds exist for the warrant and, *if served at night,* for its service at such time." But the statute does not include the italicized four words; it makes no distinction whatever between day and night, and literally read would apparently require that a special showing be made for a daytime search as well. The idea that a particularized showing must be made for searches in the daytime is completely novel and lacks even a single counterpart in other search statutes enacted by Congress.

Petitioner suggests that since Congress was concerned about the greater intrusion resulting from nighttime searches, it would be logical to apply the language, "probable cause . . . for its service at such time," only to nighttime searches. But even this interpretation, which is by no means a literal reading of the language, is not wholly convincing. The traditional limitation placed on nighttime searches, as evident from the earlier

language of Rule 41, is to require, not that there be probable cause for searching at night, but that the affiant be *positive* that the property is in fact located on the property to be searched. Thus Congress' very choice of the words "probable cause" would indicate that the earlier limitation of "positivity" was not to apply, while offering no other immediately ascertainable standard for what should constitute "probable cause" for executing a search warrant during the night.

This roundabout way of limiting nighttime searches, if that were in fact the statute's intent, would sharply contrast with the manner in which Congress has required special showings for nighttime searches in other statutes. For example, Title 23 of the D. C. Code, discussed *supra*, specifies that the warrant "be executed *during the hours of daylight*" (emphasis added) unless certain itemized conditions are met. Federal Rule Crim. Proc. 41, as amended in 1972, states: "The warrant *shall be served in the daytime* unless the issuing authority, by appropriate provision in the warrant, and for reasonable cause shown, authorizes its execution at times other than daytime." (Emphasis added.) The fact that Congress, when it has intended to require such special showings for nighttime searches, has done so in language largely free from ambiguity militates against petitioner's assertion that the language of § 879 (a) on its face supports his position.

The legislative history lends no support to petitioner's interpretation, but in fact cuts the other way. Both the House and the Senate Committee Reports on the bill incorporated a summary prepared by the Department of Justice, where much of the bill's drafting had taken place, which stated:

"Section 702 (a) [now § 879 (a)] incorporates 18 U. S. C. [§] 1405 and authorizes service of a search

warrant at any time of the day or night if probable cause has been established to the satisfaction of the judge or U. S. magistrate issuing the warrant." [39]

As previously noted, § 1405 provided that a search warrant could be served at any time of the day or night so long as the issuing officer was "satisfied that there is probable cause to believe that the grounds for the application exist . . . ." Case law had uniformly interpreted the language to mean that probable cause for the warrant itself was all that was necessary for a nighttime search.[40] The officers or agents simply had to establish probable cause for believing that the sought-after property would be found in the place to be searched.

There is no suggestion in any of the hearings or debates before Congress that a change from the prior law in this area was intended. The provision itself went unmentioned in the debates and hearings on the bill, a surprising omission if the bill effected the cutback petitioner says it did. Of like import is the fact that in the long and heated discussions over § 702 (b), the so-called "no-knock" provision of the bill, no defender of the bill saw fit to argue that any greater intrusion caused by the no-knock provision would be partially offset by the greater difficulty in obtaining warrants executable at night.[41] While congressional silence as to a particular provision of a bill during debates which give extensive consideration to neighboring provisions is not easy to interpret, it would be unusual for such a significant

---

[39] S. Rep. No. 91–613, pp. 30–31 (1969). See also H. R. Rep. No. 91–1444, pt. 1, p. 54 (1970).

[40] See n. 11, *supra*.

[41] The debates on this controversial proposal may be found generally in volume 116 of the Congressional Record. See, *e. g.*, 116 Cong. Rec. 1159–1162, 1164–1177, 33639–33645.

change as that proposed by petitioner to have entirely escaped notice.

Finally, it is important to note that the Department of Justice itself submitted this bill to Congress for enactment, including § 879 (a) in its present form. Since the hearings and debates stress that a major purpose of the bill was to supply more effective enforcement tools to combat the increasing use of narcotic drugs, it seems totally illogical to suggest that the Department of Justice would submit a bill making it substantially more difficult to control the traffic in hard drugs. Petitioner suggests that this surrender was necessary to convince Congress to bring additional drugs within the Controlled Substances Act, but that theory rests entirely on speculation. There is absolutely no indication in the legislative history that any price had to be paid for what was thought to be a much-desired reorganization and expansion of the drug laws, much less the substantial price that petitioner argues had to be paid here.

We therefore conclude that 21 U. S. C. § 879 (a) requires no special showing for a nighttime search, other than a showing that the contraband is likely to be on the property or person to be searched at that time.[42] We believe that the showing was met in this case. The affidavit submitted by the District of Columbia police officer suggested that there was a continuing traffic of drugs from petitioner's apartment, and a prior purchase through an informer had confirmed that drugs were available. This was sufficient to satisfy 21 U. S. C. § 879 (a). The judgment of the Court of Appeals for the District of Columbia Circuit is

*Affirmed.*

---

[42] We note that the Court of Appeals for the Fifth Circuit has recently reached the same conclusion. See *United States* v. *Thomas,* 489 F. 2d 664 (1973).

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BRENNAN and MR. JUSTICE MARSHALL concur, dissenting.

The petitioner is charged with possession of heroin and narcotics paraphernalia in violation of 21 U. S. C. § 174 (1964 ed.) and 26 U. S. C. § 4704 (a) (1964 ed.). He moved the District Court to suppress certain evidence seized from his home pursuant to a search warrant secured by and directed to the Metropolitan Police Department of the District of Columbia. The District Court granted the suppression motion on the ground that the search was conducted at night in violation of D. C. Code §§ 23–521–523 (1973) which limit search warrant execution to daylight hours absent specific contrary authorization founded upon the judicial officer's determination

"that (A) it cannot be executed during the hours of daylight, (B) the property sought is likely to be removed or destroyed if not seized forthwith, or (C) the property sought is not likely to be found except at certain times or in certain circumstances . . . ." D. C. Code § 23–522 (c)(1).[1]

Though the warrant here directed a search "at any time in the day or night," none of the grounds set forth in § 23–522 (c)(1) were contained in either the application or the warrant itself. The police obtained the warrant on February 11, 1971, but they failed to execute it during the day of February 12, waiting instead until 9:30 p. m. on that date. Since they delayed execution until well after the daylight hours had ended,

---

[1] D. C. Code § 23–523 (b) directs that all search warrants are to be executed only during daylight hours, absent express authorization pursuant to D. C. Code § 23–521 (f). Section 23–521 (f)(5) allows authorization for nighttime execution where the "judicial officer has found cause therefor, including one of the grounds set forth in section 23–522 (c)(1) . . . ."

the seizure was invalid if governed by .D. C. Code §§ 23–521 to 23–523.

The Court holds, however, that the D. C. Code provisions are inapplicable and that the search is governed by 21 U. S. C. § 879 (a). That section became effective October 27, 1970, as part of the Controlled Substances Act, 84 Stat. 1242, 21 U. S. C. § 801 *et seq.;* it relates to search warrants issued in connection with offenses involving controlled substances. The D. C. Code provisions, however, became effective February 11, 1971, as part of the District of Columbia Court Reform and Criminal Procedure Act. The latter Act did not distinguish between local and federal prosecutions in its procedural innovations.[2] The purpose of the restriction upon nighttime searches was to limit such intrusions to those instances where there is "some justification for it,"[3] thus implementing the "policy generally disfavoring nighttime executions, nighttime intrusions, more characteristic of a 'police state' lacking in the respect for due process and the right of privacy dictated by the U. S. Constitution and history : . . ."[4]

Approximately 60% of the search warrants issued in the District of Columbia relate to narcotics violations. Congress was aware of this, and, if it had intended to except federal narcotics search warrants from the protections against unnecessary nighttime "police state" searches, one would expect an expression of such intent. I agree with Judge Gesell that no such intent is indicated.

---

[2] Thus various rules are applicable in the United States District Court for the District of Columbia which are not applicable in district courts elsewhere in the country. See, *e. g.*, D. C. Code § 23–1322, dealing with detention prior to trial.

[3] Hearings on Crime in the National Capital before the Senate Committee on the District of Columbia, 91st Cong., 1st Sess., pt. 4, p. 1404 (1969).

[4] S. Rep. No. 91–538, p. 12 (1969).

Thus, "[w]hatever be the standards generally for issuance of a nighttime search warrant in federal narcotics cases in other parts of the country . . . the existence of 21 U. S. C. § 879 (a) does not remove such cases from the explicit requirements for search warrants in the District of Columbia under the newly enacted Title 23, D. C. Code." 328 F. Supp. 1005, 1007. I would reverse the Court of Appeals and sustain the District Court's suppression order.

MR. JUSTICE MARSHALL, with whom MR. JUSTICE DOUGLAS and MR. JUSTICE BRENNAN join, dissenting.

I agree with my Brother DOUGLAS that the provisions of the District of Columbia Code requiring a showing of need for execution of a search warrant at night govern the search involved in this case, and, accordingly, I join in his dissenting opinion. A majority of the Court, however, rejects this argument and goes on to discuss the standards imposed by 21 U. S. C. § 879 (a) upon issuance of search warrants for nighttime execution in federal narcotics cases. Obviously, the Court's interpretation of § 879 (a) is of far greater significance, of national rather than purely local concern. I cannot let the Court's construction of § 879 (a) pass without registering my dissent on this issue as well.

The opinion of the Court, it seems to me, analyzes the § 879 (a) issue in a vacuum, without any discussion of some of the important policy considerations which underlie this question of statutory interpretation. Perhaps a partial vacuum would be a more appropriate description, since the Court is obviously fully cognizant of the substantial governmental interest in enforcement of the narcotics laws, an interest which its interpretation of § 879 (a) so well serves. But plainly there are other concerns implicated in our interpretation of this con-

gressional enactment restricting the issuance of search warrants—the protection of individual privacy which is the very purpose of the statute's search warrant requirement and which of course is given constitutional recognition in the Fourth Amendment. The Court seems totally oblivious to these constitutional considerations. Taking them into account, I find that the only acceptable interpretation of the statute is one which requires some additional justification for authorizing a nighttime search over and above the ordinary showing of probable cause to believe that a crime has been committed and that evidence of the crime will be found upon the search.

Fundamentally at issue in this case is the extent of the protection which we will all enjoy from police intrusion into the privacy of our homes during the middle of the night. The Fourth Amendment was intended to protect our reasonable expectations of privacy from unjustified governmental intrusion. *Katz* v. *United States,* 389 U. S. 347, 360–362 (1967) (Harlan, J., concurring). In my view, there is no expectation of privacy more reasonable and more demanding of constitutional protection than our right to expect that we will be let alone in the privacy of our homes during the night. The idea of the police unnecessarily forcing their way into the home in the middle of the night—frequently, in narcotics cases, without knocking and announcing their purpose—rousing the residents out of their beds, and forcing them to stand by in indignity in their night clothes while the police rummage through their belongings does indeed smack of a "'police state' lacking in the respect for . . . the right of privacy dictated by the U. S. Constitution." S. Rep. No. 91–538, p. 12 (1969). The public outrage at the series of mistaken nighttime raids by narcotics agents in Collinsville, Illinois, last

April, see N. Y. Times, Apr. 29, 1973, p. 1, col. 5; N. Y. Times, Apr. 30, 1973, p. 30, col. 1, serves to emphasize just how inconsistent with our constitutional guarantees such nighttime searches are.

This Court has consistently recognized that the intrusion upon privacy engendered by a search of a residence at night is of an order of magnitude greater than that produced by an ordinary search. Mr. Justice Harlan observed in holding a nighttime search unconstitutional in *Jones* v. *United States,* 357 U. S. 493, 498 (1958): "[I]t is difficult to imagine a more severe invasion of privacy than the nighttime intrusion into a private home." In *Coolidge* v. *New Hampshire,* 403 U. S. 443, 477 (1971), the Court again recognized that a midnight entry into a home was an "extremely serious intrusion." And our decision in *Griswold* v. *Connecticut,* 381 U. S. 479 (1965), was in large part based upon our revulsion at the thought of nighttime searches of the marital bedroom to discover evidence of illegal contraceptive use. See *id.,* at 485–486.

It is small wonder, then, that Congress has consistently required more stringent justification for nighttime searches than that needed to authorize a search during the day. The first congressional enactment setting out comprehensive search warrant procedures, § 10 of Tit. XI of the Espionage Act of 1917, 40 Stat. 217, 229, 18 U. S. C. § 62r (1940 ed.), required that the affiant must be "positive" that the property to be seized was on the premises to justify a nighttime search. When the provisions of the Espionage Act were replaced by the Federal Rules of Criminal Procedure in 1946, this requirement of positivity was carried forward in Rule 41. Despite the stringency of this requirement, it remained with us until very recently, until the 1972 amendments to Rule 41. And although the Rule was then modified to require

"reasonable cause" for nighttime execution of a warrant, significantly the amended Rule retained the principle that nighttime searches require an additional showing of justification over and above probable cause. Congress has also manifested its concern for protection of individual privacy against nighttime searches in its legislation for the District of Columbia, as MR. JUSTICE DOUGLAS' opinion amply demonstrates with respect to enactment of the D. C. Court Reform and Criminal Procedure Act in 1970. *Ante,* at 460.[1]

The strong policy underlying these congressional enactments is clear. As even the Government in this case concedes, "searches conducted in the middle of the night . . . involve a greater intrusion than ordinary searches and therefore require a greater justification." Brief for United States 14. In my view, this principle may well be a constitutional imperative. It is by now established Fourth Amendment doctrine that increasingly severe standards of probable cause are necessary to justify increasingly intrusive searches. In *Camara* v. *Municipal Court,* 387 U. S. 523 (1967), after holding that search warrants were required to authorize administrative inspections, we held that the quantum of probable cause required for issuance of an inspection warrant must be determined in part by the reasonableness of the proposed search. As MR. JUSTICE WHITE stated, "there can be no ready test for determining reasonableness other than by balancing the need to search against the invasion which the search entails." *Id.,* at 536–537. The Court in *Camara* thus approved the issu-

---

[1] Similarly, most of the States' laws provide that search warrants may only be served during the day unless express authorization for a nighttime search is obtained, and such authorization can generally be obtained only by meeting special requirements for a nighttime search. See L. Hall, Y. Kamisar, W. LaFave & J. Israel, Modern Criminal Procedure 259 (3d ed. 1969).

ance of area inspection warrants in part because such searches "involve a relatively limited invasion of the urban citizen's privacy." *Id.*, at 537. See also *Terry* v. *Ohio*, 392 U. S. 1, 20–21 (1968); *Couch* v. *United States*, 409 U. S. 322, 349 n. 6 (1973) (MARSHALL, J., dissenting). I do not regard this principle as a one-way street, to be used only to water down the requirement of probable cause when necessary to authorize governmental intrusions. In some situations—and the search of a private home during nighttime would seem to be a paradigm—this principle requires a showing of additional justification for a search over and above the ordinary showing of probable cause. Cf. *Stanford* v. *Texas*, 379 U. S. 476, 485–486 (1965).

Of course, this constitutional question is not presented in this case and need not be resolved here. But the long history of congressional authorization of nighttime searches only upon a showing of additional justification, the strong constitutionally based policy which these statutes implement, and the substantial constitutional question posed by the majority's interpretation of § 879 (a) are surely relevant to the question of statutory interpretation with which we are faced. Viewed against this background, I think it is plain that the majority's interpretation of the statute should be rejected

Section 879 (a) provides that search warrants may be executed at night only if "there is probable cause to believe that grounds exist for the warrant and for its service at such time." It seems to me quite clear that the statute, on its face, imposes two distinct requirements: that there be probable cause for the issuance of the warrant, and that there be cause "for its service at such time." While the Court relies on legislative history which suggests that § 879 (a) merely "incorporates" the provisions of its predecessor, 18 U. S. C. § 1405 (1964 ed.), the plain

fact is that § 879 (a) does far more than this: it also adds to the language of § 1405 the final clause—"and for its service at such time"—which is at the heart of the dispute in this case. I can see no plausible interpretation of this final clause other than that it imposes an additional requirement of justification for a search at night over and above a showing of probable cause.

The Court, while conceding this to be a "possible" meaning of the statute's final clause, argues that "it is by no means the only possible meaning attributable to the words." *Ante,* at 455. Unfortunately, the Court then fails to come forward with any alternative interpretation of these final words of § 879 (a). Instead, the Court simply reads the disputed language out of the statute entirely, and decrees that the statute shall be interpreted as if it were not there. The Court holds that the statute requires only "a showing that the contraband is likely to be on the property or person to be searched at that time" to justify nighttime execution of a search warrant. *Ante,* at 458. But the showing of probable cause required for issuance of any warrant necessarily includes a showing that the objects to be seized will probably be found on the premises at the time of the search. See *Sgro* v. *United States,* 287 U. S. 206, 210–211 (1932); *Schoeneman* v. *United States,* 115 U. S. App. D. C. 110, 113, 317 F. 2d 173, 176–177 (1963); *Rosencranz* v. *United States,* 356 F. 2d 310, 315–318 (CA1 1966). This requirement is clearly imposed by the Fourth Amendment itself. It is also clearly mandated by the first part of the statutory language, which merely incorporates the constitutional requirement of probable cause for issuance of the warrant. The majority's interpretation of the statute thus leaves the final clause of § 879 (a)—the language in controversy here—totally without meaning. See *United States* v. *Thomas,* 294 A. 2d 164, 170 (DC Ct. App.)

(Kelly, J., dissenting), cert. denied, 409 U. S. 992 (1972) ; *United States* v. *Gooding*, 155 U. S. App. D. C. 259, 273, 477 F. 2d 428, 442 (1973) (Robinson, J., concurring in result). I cannot subscribe to such an evisceration of the statute.[2]

---

[2] In an effort to conjure up ambiguity in the statutory language, the Court argues that the statute could have been drawn with more precision, and specifically points out that read literally, the statutory requirement of cause "for its service at such time" would seem to apply to daytime searches as well as those conducted at night. *Ante,* at 455–456. I readily agree that the statute could have been more artfully drafted, but the fact that it could have been stated in different words hardly justifies disregarding the plain meaning of the statutory language with which we must deal. It ill suits the Court to suggest that this language is ambiguous when the Court is unable to come forward with any plausible alternative construction.

The Court's suggestion that the statute is ambiguous because it could be literally applied to daytime searches as well as those during the night is wholly insubstantial. As the Court well knows, no one has ever proposed that an additional burden of justification for daytime searches is necessary or appropriate; in sharp contrast, the Congress has consistently acted to protect nighttime privacy through such an additional burden on nighttime searches. The Court's confusion arises only because the words "at such time" in the statute logically refer back to its authorization of service "at any time of the day or night." But this latter phrase has consistently been used in congressional enactments as a shorthand expression for a warrant whose service at night is authorized, see, *e. g.,* D. C. Code § 33–414 (h), *ante,* at 433 n. 3; §§ 23–521 (f) (5), 23–522 (c) (1), *ante,* at 435–436, n. 4; cf. former Fed. Rule Crim. Proc. 41 (c), *ante,* at 436–437, n. 5, to distinguish such a warrant from any other warrant, which may be served only in the day. Plainly the statute's requirement of cause "for its service at such time" was intended to apply only to nighttime execution of search warrants.

As for the Court's complaint that a requirement of cause for nighttime service of a warrant is not the "traditional limitation" imposed upon nighttime searches, it should suffice to point out that Congress became aware in its consideration of the D. C. Court Reform and Criminal Procedure Act in 1969 that a requirement of cause would provide *greater* protection for nighttime privacy than the old posi-

The Court bases its holding upon the meager recorded legislative history of § 879 (a). But when the language of a statute is as clear and unambiguous as it is here, it is neither helpful nor appropriate to look to its legislative history. *Ex parte Collett,* 337 U. S. 55, 61 (1949); *United States* y. *Oregon,* 366 U. S. 643, 648 (1961). While committee reports in particular are often a helpful guide to the meaning of ambiguous statutory language, even they must be disregarded if inconsistent with the plain language of the statute. *Helvering* v. *City Bank Farmers Trust Co.,* 296 U. S. 85, 89 (1935); *George Van Camp & Sons Co.* v. *American Can Co.,* 278 U. S. 245, 253–254 (1929). It is the language of the statute, as enacted by the Congress, that is the law of the land, not the language of a committee report which may or may not represent accurately the views of the hundreds of other legislators who voted for the bill.

In any event, even if resort to examination of the legislative history were appropriate here, I do not find it nearly so conclusive as does the majority of the Court. The Court relies on a single brief statement on § 879 (a) in the committee report stating that the statute merely incorporated the provisions of § 1405, which had been construed not to impose any requirement for a nighttime search warrant over and above probable cause. Yet this statement fails to provide any explanation for the language which Congress added to § 1405, the language

---

tivity test, by eliminating unnecessary nighttime searches regardless of how sure police were of their basis for the search. See Hearings on Crime in the National Capital before the Senate Committee on the District of Columbia, 91st Cong., 1st Sess., pt. 4, p. 1404 (1969); Brief for United States 49–50. This change was therefore incorporated into the D. C. Code, see D. C. Code §§ 23–521 to 23–523. It was also adopted in the 1972 amendment to Rule 41. It would hardly be surprising for the Congress to introduce a modification along the same lines into § 879 (a).

in controversy here. As to the meaning—or, as the Court would have it, the lack of meaning—of this language, the Court relies basically upon the law enforcement goals of the Department of Justice and the silence of Congress. But, as we have frequently warned, "[i]t is at best treacherous to find in congressional silence alone the adoption of a controlling rule of law." *Girouard* v. *United States,* 328 U. S. 61, 69 (1946); see H. M. Hart & A. Sacks, The Legal Process:Basic Problems in the Making and Application of Law 1395–1398 (tent. ed. 1958), and cases there cited. The Court in effect presumes from Congress' failure to explain the meaning of the final clause of § 879 (a) its acquiescence in the Justice Department's apparent view that this language in fact serves no purpose.

I would presume the contrary. Congress' consistent protection of nighttime privacy by imposing restrictions upon the availability of warrants for nighttime searches reinforces the unambiguous statutory language. Both lead me to the conclusion that the final clause of § 879 (a) must be viewed as another congressional manifestation of its strong policy against nighttime intrusions into the home. I do not think that this interpretation is at all inconsistent with the narcotics law-enforcement objectives which were the principal focus of this legislation. The requirement that cause be shown for the necessity of a nighttime search is still a substantial easing of the requirement of positivity which was then embodied in Rule 41, and which would otherwise have applied to many of the searches now covered by § 879 (a). I respectfully dissent.