**UNITED STATES of America**

v.

**Alfred M. LAWSON and Thomas E. Lane, Jr.**

**Crim. No. M–80–0249.**

United States District Court, D. Maryland.

Oct. 8, 1980.

Russell T. Baker, Jr., U. S. Atty., Gerald M. Richman, and Robert N. McDonald, Asst. U. S. Attys., Baltimore, Md., for plaintiff.

Fred Warren Bennett, Paul W. Spence, Deborah E. Jennings, and Kathleen S. Downs, Baltimore, Md., for defendants.

## MEMORANDUM AND ORDER

JAMES R. MILLER, Jr., District Judge.

This case is before the court on defendants' motion to dismiss the indictment against them on the ground of alleged grand jury abuse.[1] A hearing was held on

1. At the conclusion of a motions hearing on September 18, 1980, the court reserved its ruling on a number of other defense pretrial motions. In light of the court's decision to dismiss

September 18, 1980, and the parties subsequently submitted supplemental memoranda.[2] Having reviewed the materials submitted by the parties and the testimony adduced at the hearing, the court concludes that the indictment against defendants Lawson and Lane should be dismissed, without prejudice.

### I. Factual Background

Defendants Alfred M. Lawson, Thomas E. Lane, Jr., and Ronald Vance Smith[3] were indicted by a federal grand jury on June 25, 1980. Count I of the indictment charges a single conspiracy between Lawson, Lane, Smith and others to distribute dilaudid, preludin, and tuinal, all Schedule II Controlled Substances. 21 U.S.C. § 846. Counts II–IX charge them with distributing preludin and tuinal, and Counts X–XXIV charge them with distributing dilaudid. 21 U.S.C. § 841(a)(1).

This indictment grew out of investigations by the Maryland State Police and the Drug Enforcement Administration (DEA) of two Maryland pharmacies: Fenwick Pharmacy, Inc., in Ocean City, Maryland, and Lawson & Sons Pharmacy, Inc., in Hyattsville, Maryland.[4] In brief, the indictment charges that during the period from October, 1976 through February, 1979, defendant Lawson filled fictitious prescriptions, written by Dr. Lynn H. Possinger of Philadelphia, and transferred the controlled substances to defendant Smith. Similarly, defendant Lane is alleged to have filled fictitious prescriptions during the period

from December, 1977 through February, 1979, written by Dr. Marshall D. Nickerson of Washington, D. C., and to have transferred the controlled substances to defendant Smith.

Defendants' motion to dismiss focuses primarily upon the appearance of Robert Sampson before the indicting grand jury on August 1, 1979. Sampson, a registered pharmacist and an employee of Fenwick Pharmacy, Inc., had testified before a prior grand jury on November 8, 1978. His testimony before both grand juries concerned whether defendant Lawson had attempted to verify the legitimacy of Dr. Possinger's prescriptions for controlled substances prior to their being filled at Fenwick Pharmacy, Inc.[5]

The transcript of the November 8, 1978 grand jury proceedings indicates that Sampson testified that Lawson had told him that, prior to filling Dr. Possinger's prescriptions, Lawson had called both the doctor's office and the Philadelphia Police Narcotics Squad. (Sampson Grand Jury Testimony, November 8, 1978, at 11). Sampson also testified that he was present when some of the calls were made. (Sampson Grand Jury Testimony, November 8, 1978, at 20–21). Subsequently, the Assistant United States Attorney in charge of the case[5a] subpoenaed the telephone records of Fenwick Pharmacy, Inc., (See Paper No. 30, Exhibit B), and had DEA Compliance Officer Wilbur N. West prepare a summary of

---

the indictment, it is unnecessary to rule expressly on all of defendants' motions.

**2.** On September 29, 1980, the United States Attorney for the District of Maryland, pursuant to Rule 48(a), F.R.Crim.P., moved to dismiss the indictment, without prejudice. The government admitted that the prosecutor's conduct before the indicting grand jury was inappropriate but contended that a dismissal without prejudice was the proper remedy. *See* note 9 and accompanying text *infra*.

**3.** Defendant Smith is a fugitive.

**4.** Defendant Lawson is a registered pharmacist and co–owner of both pharmacies. Defendant Lane is a registered pharmacist at Lawson &

Sons, Inc., and also serves as secretary–treasurer of that corporation.

**5.** Although Sampson's grand jury testimony concerned only Lawson's activities, defendant Lane contends that if abuse is found, he also is entitled to relief because they were indicted by the same grand jury and the evidence as to each was not segregated. Defendant Lane also notes that all defendants were indicted for a single conspiracy involving both pharmacies.

**5a.** The name of the Assistant United States Attorney whose actions are at issue here has been deleted from this published opinion. He is referred to hereafter as "the Assistant United States Attorney" or "the prosecutor".

the relevant calls (See Paper No. 30, Exhibit C). These records show that on October 29, 1976, four telephone calls were placed from Fenwick Pharmacy, Inc., to numbers in Philadelphia: Two calls to Dr. Possinger's office; one call to Philadelphia's municipal information number, and one call to the Philadelphia Narcotic Squad.[6]

Immediately before Sampson's August 1, 1979, grand jury appearance, a DEA compliance officer read to the jurors Sampson's testimony from November 8, 1978. Thereafter, the Assistant United States Attorney called Sampson to testify and undertook to discredit Sampson regarding Lawson's alleged calls to Philadelphia. (Sampson Grand Jury Testimony, August 1, 1979, at 17–23, 34–36, 58–59, 63–64, 96–98). At no time did anyone from the government give to the grand jury Officer West's summary of Fenwick Pharmacy's telephone records, or even reveal to the grand jury that the calls had been made.[7] Thus, rather than introducing the telephone records to corroborate Sampson's testimony concerning the phone calls, the Assistant United States Attorney embarked upon a grueling cross–examination of Sampson, apparently designed to give the jurors the impression that Lawson had never called Philadelphia and that Sampson was trying to cover for him.

Defendants contend that the prosecutor's conduct was not simply a matter of failing to present known, exculpatory evidence to the grand jury. Rather, they assert, it was an affirmative attempt both to discredit Sampson and to turn exculpatory evidence into inculpatory evidence. Defendants also point out that Sampson's testimony was material because his was the only live testi-

---

**6.** At the hearing on September 18, 1980, Officer Mark Moger, formerly of the Philadelphia Narcotics Squad, testified that he remembered receiving a call from a pharmacist in Ocean City, Maryland concerning Dr. Possinger. The caller wanted to know whether there was any reason not to fill Dr. Possinger's prescriptions. Moger testified that he told the pharmacist that if the prescriptions appeared to be legitimate, he knew of no reason not to fill them. Moger also testified that he was on duty from 9:00 a. m. to 5:00 p. m. on October 29, 1976.

Officer Henry Tufts, who worked with Officer Moger in 1976, also testified that he received a call from a Maryland pharmacist concerning Dr. Possinger's prescriptions. However, until contacted by defense counsel after defendants had been indicted, neither of these officers had been interviewed by the prosecutor. Yet, the following occurred during Sampson's August 1, 1979 grand jury appearance:

Q. Are you aware that Mr. Lawson also spoke to an investigator from Philadelphia, from the DEA office in Philadelphia?

A. I think he did.

Q. He also told them that he contacted the narcotics squad in Philadelphia and he talked to Mr. Tuffs [sic] and Mr. Mosner [sic]. Did those names ring a bell?

A. Not really.

Q. *Would it surprise you if I told you that Mr. Tuff [sic] and Mr. Mosner [sic] say they never heard of Mr. Lawson or the Fenwick Pharmacy and never spoke to Mr. Lawson and in fact on the day the call was alleged to have been made Mr. Tuff was working the midnight shift?*

A. That would surprise me.

Q. Why would it surprise you?

A. Because I have no reason to disbelieve him.

Q. Oh, he just said that you were there when he made the phone call?

A. One of the phone calls. He made more than one phone call.

Q. *If he made more than one phone call wouldn't Mr. Tuff [sic] and Mr. Mosner [sic] remember the name Fenwick Pharmacy?*

A. I think they should. I can't say they would.

Q. *What if they indicated they never heard of it?*

A. I can't answer that."

(Sampson Grand Jury Testimony, August 1, 1979 at 19–20). (Emphasis supplied).

**7.** In fact, the prosecutor attempted to create the impression that Fenwick's records established that Lawson had never made the verification calls:

"Q. Let's go back. So you had your doubts about these prescriptions and that you were there when Mr. Lawson made the phone calls to verify that in fact these prescriptions were legitimate, is that correct?

A. I can remember on occasion being in when he called to verify it.

Q. *What if I told you that Mr. Lawson's telephone tolls for that period don't reflect any phone calls to Philadelphia?*

A. What am I supposed to say?

Q. You just told me you were there.

A. That's what I believed. I didn't watch him dial area code 215."

(Sampson Grand Jury Testimony, August 1, 1979, at 22). (Emphasis supplied).

mony relating directly to Lawson's activities at Fenwick Pharmacy, Inc.[8]

■ While arguing that the telephone records were not material to the indictment because other witnesses testified before the grand jury about Lawson's activities at Fenwick Pharmacy, Inc., and asserting that the records are not themselves exculpatory, the government declined to present evidence at the motions hearing rebutting the inference that the Assistant United States Attorney's examination of Sampson constituted a deliberate effort to place false and misleading evidence before the grand jury. Thus, in the absence of a sufficient government explanation, the court finds that the prosecutor's questions to Sampson were deliberately misleading and calculated to create a false impression on the grand jury.

## II. The "Aggravating Circumstances"

Conceding the impropriety of the Assistant United States Attorney's actions,[9] the government nevertheless contends that any dismissal should be without prejudice to subsequent reindictment. The government maintains that resubmitting the matter to a new grand jury would eliminate any infringement of defendants' rights because the new grand jury would be "untainted," and the exculpatory evidence would be presented for its consideration. The government further notes that since the pretrial process has been completed in this case, it would not have to be repeated if a new indictment were returned against defendants.

In response, defendants argue that the prosecutorial misconduct regarding Sampson was compounded by the following "aggravating circumstances":

1. The thirty–seven (37) month "delay" between the beginning of the investigation and the filing of the indictment.

2. The use of administrative inspection warrants to gather evidence for a criminal prosecution.

3. The government's transfer of information subpoenaed by the first grand jury to subsequent grand juries without an order under Rule 6(e), F.R.Crim.P.

4. Disclosure by Officer West to a representative of the Maryland Attorney General of a DEA investigative synopsis containing information that was presented to the indicting grand jury, without a Rule 6(e) order.

Although the court concludes that none of these factors alone entitles defendants to a dismissal with prejudice, their impact, if any, will be considered as part of the totality of the case.

### A. Pre–indictment Delay

■ The issue of pre–indictment delay was also raised by defendants in a separate motion to dismiss. Based on the evidence adduced at the hearing of September 18, 1980, the court concludes that defendants are not entitled to a dismissal of the indictment, with prejudice, on the ground of pre–indictment delay. The court finds that the "delay" was not the result of a government attempt to achieve a tactical advantage. To the contrary, the evidence establishes that this case was given low priority because the DEA investigators did not believe that Lawson was involved in an illegal narcotics operation prior to the arrest of Lane by the Maryland State Police in February, 1979. Further, defendants have suffered no actual prejudice in terms of their putting on a defense on the merits. *See, e. g., United States v. Lovasco,* 431 U.S. 783, 789–90, 795–96, 97 S.Ct. 2044, 2048, 2051, 52 L.Ed.2d 752 (1977); *United States v. Marion,* 404 U.S. 307, 322–24, 92 S.Ct. 455, 464–65, 30 L.Ed.2d 468 (1971).

---

**8.** Dr. Possinger testified on April 9, 1980 before the grand jury that he wrote prescriptions in the names of persons taken from the telephone book and sold them to defendant Smith. He also testified that he had never heard of or dealt with Lawson. (Possinger Grand Jury Testimony, at 15). Officer West testified before the Grand Jury regarding the prescriptions for controlled substances filled at both pharmacies.

**9.** Government's Motion to Dismiss Without Prejudice, filed September 30, 1980 (Paper No. 49).

### B. The Administrative Inspection Warrants

On July 9, 1979, DEA Compliance Officer West applied for administrative inspection warrants, pursuant to section 510 of the Comprehensive Drug Abuse Control Act of 1970 (Drug Control Act), 21 U.S.C. § 880, purportedly to inspect Lawson and Sons Pharmacy, Inc., and Fenwick Pharmacy, Inc., for violations of the Drug Control Act's record keeping requirements. The administrative warrants were executed on July 9, 1979, and a search for and seizure of records kept in the pharmacies was conducted by DEA personnel.

At the hearing of September 18, 1980, it was established through the testimony of Officer West that he applied for the administrative warrants at the request of the Assistant United States Attorney, who was conducting a criminal investigation of the defendants. It was further established that the government had made an institutional committment to the defendants' criminal prosecution on June 21, 1979, and that the administrative warrants were used solely to gather evidence for that criminal prosecution. The court also found that, at the time Officer West applied for the administrative warrants, neither the DEA nor the United States Attorney's Office had a civil or administrative purpose for the information they sought to obtain.

Defendants contend that these facts establish a violation of the principles enunciated in *United States v. LaSalle National Bank*, 437 U.S. 298, 98 S.Ct. 2357, 57 L.Ed.2d 221 (1978). The issue in *LaSalle* concerned the enforcement of an IRS summons, issued pursuant to I.R.C. § 7602, when the issuing agent was conducting his investigation "solely for the purpose of unearthing evidence of criminal conduct." 437 U.S. at 308, 98 S.Ct. at 2363. In remanding the case for further proceedings, · the Supreme Court agreed that the IRS could not issue a summons solely to aid a criminal investigation but ruled that "whether an investigation has solely criminal purposes must be answered only by an examination of the institutional posture of the IRS," and not by the "personal intent" of the special agent, 437 U.S. at 316, 98 S.Ct. at 2367. The Court's limiting of the IRS's use of its summons power, however, was not based on Fourth Amendment considerations. Rather, the Court stated that "nothing in section 7602 or its legislative history suggests that Congress intended the summons authority to broaden the Justice Department's right of criminal litigation discovery or to infringe on the role of the Grand Jury as a principal tool of criminal accusation." 437 U.S. at 312, 98 S.Ct. at 2365. The principles outlined in *LaSalle*, therefore, are not dispositive of the questions raised in this case.

The government contends that, unlike the statutory scheme at issue in *LaSalle*, Congress intended the DEA to use administrative warrants under the Drug Control Act to gather evidence of criminal conduct. To sustain the use of an administrative warrant for purely criminal investigative purposes, the government asserts it need demonstrate only that it was applied for in "good faith" for *any purpose* within the coverage of Subchapter I of the Drug Control Act, 21 U.S.C. §§ 801 to 904, entitled "Control and Enforcement." The authority to use administrative warrants is set forth in Part E of Subchapter I, which is entitled "Administrative and Enforcement Provisions," 21 U.S.C. §§ 871 to 904. Along with administrative inspection warrants, 21 U.S.C. § 880, Part E authorizes the use of subpoenas, 21 U.S.C. § 876, and traditional search warrants, 21 U.S.C. § 879.

The government's argument that administrative inspection warrants may be used for any purpose listed in Subchapter I, including investigations designed solely to result in criminal prosecutions, is untenable. While the statutory scheme set forth in Subchapter I does include both regulatory and criminal enforcement functions, the reason for such inclusion was to bring together, in one comprehensive statute, functions previously assigned to a variety of agencies under several statutes, not to blur the distinctions between regulatory and criminal enforcement functions. *See* H.R.

Rep.No.1444, 91st Cong., 2d Sess., *reprinted in* [1970] U.S.Code Cong. & Adm.News, pp. 4566, 4566–76; S.Rep.No.925, 93d Cong., 2d Sess., *reprinted in* [1974] U.S.Code Cong. & Ad.News, pp. 5971, 5972–74.

Further, the legislative history explaining why Congress included a provision for administrative inspection warrants demonstrates that Congress understood there to be a difference between administrative regulation and criminal enforcement:

> "The provisions authorizing the issuance of judicial warrants for administrative inspections under the bill have been inserted because of the Supreme Court's decisions in *Camara v. Municipal Court* [387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930] and *See v. Seattle* [387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943] . . . The Court held that in both instances a warrant was constitutionally required, but that probable cause for a warrant should be determined in light of a 'flexible standard of reasonableness that takes into account the public need for effective enforcement of the particular regulation involved' . . . In deference to these decisions a provision for administrative inspections has been inserted in the bill as above described."

H.R.Rep.No.1444, 91st Cong., 2d Sess., *reprinted in* [1970] U.S.Code Cong. & Ad. News, 4566, 4623 (citations omitted).

█ As the Supreme Court recently explained in *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978), *Camara* and *See* stand for the proposition that the Fourth Amendment does apply to administrative inspections. "If the government intrudes on a person's property, the privacy interest suffers whether the government's motivation is to investigate violations of criminal laws or breaches of other statutory or regulatory standards." 436 U.S. at 312–13, 98 S.Ct. at 1820.

█ In requiring a warrant for administrative inspections, however, the Supreme Court declined to impose the requirement that full probable cause be shown.

> "Probable cause in the criminal law sense is not required. For purposes of an administrative search such as this, probable cause justifying the issuance of a warrant may be based not only on specific evidence of an existing violation but also on a showing that 'reasonable legislative or administrative standards for conducting an . . . inspection, are satisfied with respect to a particular [establishment].' "

436 U.S. at 320, 98 S.Ct. at 1824, *citing Camara v. Municipal Court*, 387 U.S. at 538, 87 S.Ct. at 1735. A lower standard of probable cause is constitutionally permissible in the administrative inspection context because the intrusion into an individual's privacy is less than that in the criminal context, and is outweighed by the public's interest in the regulatory program. *Zurcher v. Stanford Daily*, 436 U.S. 547, 554–56, 98 S.Ct. 1970, 1975–77, 56 L.Ed.2d 525 (1978); *Marshall v. Barlow's, Inc.*, 436 U.S. at 320–21, 98 S.Ct. at 1824–25; *Camara v. Municipal Court*, 387 U.S. at 534–35, 87 S.Ct. at 1733–34. But once the purpose behind the search shifts from administrative compliance to a quest for evidence to be used in a criminal prosecution, the government may constitutionally enter the premises only upon securing a warrant supported by full probable cause. *Michigan v. Tyler*, 436 U.S. 499, 508, 512, 98 S.Ct. 1942, 1949, 1951, 56 L.Ed.2d 486 (1978).

█ In this case the sole purpose behind the July 9, 1979, pharmacy searches was to gather evidence for a criminal prosecution. Although the Drug Control Act expressly authorizes the use of traditional search warrants to aid in the enforcement of its criminal provisions, 21 U.S.C. § 879, *see Gooding v. United States*, 416 U.S. 430, 94 S.Ct. 1780, 40 L.Ed.2d 250 (1974), the government in this case purposefully employed an administrative inspection warrant with its lower standard of probable cause. The court holds, therefore, that the July 9, 1979, searches violated the Fourth Amendment, because they were criminal searches unsupported by a warrant based on full probable cause and were not within any of the recognized exceptions to the warrant requirement.

The court is aware that two Courts of Appeals have apparently found lawful the DEA's use of administrative inspection warrants to gather evidence for a criminal prosecution. *See United States v. Prendergast*, 585 F.2d 69 (3rd Cir. 1978); *United States v. Goldfine*, 538 F.2d 815 (9th Cir. 1976). In the former case, however, the Third Circuit panel opinion expressly noted that there was no commitment to criminal prosecution by the DEA prior to the issuance of the administrative warrant in that case. 585 F.2d at 71, fn. 1. In the latter case, the Ninth Circuit panel did not focus on the question of the validity of an administrative search where there had been a prior commitment by the DEA to criminal prosecution and no administrative purpose for the search. 538 F.2d at 819. To the extent that these cases, if at all, would permit the use of administrative inspection warrants on the facts of this case, the court declines to follow them.

 Although the government's use of the administrative warrants did violate defendants' Fourth Amendment rights, the indictment against them was not thereby rendered defective. *United States v. Calandra*, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974). *See* 1 W. La Fave, *Search and Seizure: A Treatise on the Fourth Amendment* § 1.4(c) (1978). The court does hold, however, that the evidence seized during the July 9, 1979, searches must be excluded from any criminal trial the defendants may face.

 Application of the exclusionary rule is not a constitutional requirement. Rather, it is a court–made rule used in the Fourth Amendment context to deter government misconduct. *See, e. g., Michigan v. DeFillippo*, 443 U.S. 31, 38 n. 3, 99 S.Ct. 2627, 2633 n. 3, 61 L.Ed.2d 343 (1979); *Stone v. Powell*, 428 U.S. 465, 482–92, 96 S.Ct. 3037, 3046–51, 49 L.Ed.2d 1067 (1976); *United States v. Calandra*, 414 U.S. at 348, 94 S.Ct. at 62. Although the recent trend of Supreme Court decisions has been to limit the scope of the exclusionary rule in implementing Fourth Amendment protections, *see, e. g., United States v. Caceres*,

440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979); *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978); *United States v. Janis*, 428 U.S. 433, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976), the exclusionary rule remains an appropriate remedy when the government misconduct is flagrant and in "bad faith." *Cf. United States v. Williams*, 622 F.2d 830, 840–46 (5th Cir. 1980) (en banc) (exclusionary rule inapplicable when police conduct resulting in discovery of evidence was taken in good faith, and in reasonable, although mistaken, belief that conduct was authorized). *See generally* Miles, Decline of the Fourth Amendment: Time to Overrule Mapp v. Ohio?, 27 *Cath.U. L.Rev.* 9 (1977).

### C. Rule 6(e) Violations

The first alleged Rule 6(e) violation concerns the Possinger prescriptions that were subpoenaed by the first grand jury. That grand jury never saw the actual documents and did not hear testimony concerning defendants' activities at the pharmacies. The second grand jury heard testimony from several witnesses but was not presented with any records and did not consider an indictment. The third and indicting grand jury heard the testimony of several witnesses but was not shown the actual prescriptions. Information concerning them was presented through the testimony of Officer West.

It is undisputed that the government never prepared a Rule 6(e) order in connection with the transfer of the subpoenaed documents from the first grand jury to the second and third grand juries. Moreover, no grand jury was presented with the actual prescriptions and only the indicting grand jury heard specific testimony concerning these documents.

The Supreme Court has often noted that secrecy of grand jury proceedings is necessary if that body is to fulfill its proper functions, *see, e. g., United States v. Proctor & Gamble Co.*, 356 U.S. 677, 78 S.Ct. 983, 2 L.Ed.2d 1077 (1959), and Rule 6(e) was adopted to implement this policy of secrecy. *Douglas Oil Co. v. Petrol Stops Northwest*,

441 U.S. 211, 218–19 n. 9, 99 S.Ct. 1667, 1672–73 n. 9, 60 L.Ed.2d 156 (1978). The interests Rule 6(e) was designed to protect are as follows:

> "(1) To prevent the escape of those whose indictment may be contemplated; (2) to insure the utmost freedom to the grand jury in its deliberations, and to prevent persons subject to indictment or their friends from importuning the grand jurors; (3) to prevent subornation of perjury or tampering with the witness who may testify before [the] grand jury and later appear at the trial of those indicted by it; (4) to encourage free and untrammeled disclosures by persons who have information with respect to the commission of crimes; (5) to protect innocent accused who is exonerated from disclosure of the fact that he has been under investigation, and from the expense of standing trial where there was no probability of guilt."

441 U.S. at 219, n. 10, 99 S.Ct. at 1673, n. 10.

■ The indicting grand jury's use of the Possinger prescriptions subpoenaed by the first grand jury, through the testimony of Officer West, does not pose a serious threat to any of these interests. Moreover, no evidence has been produced suggesting that the government's failure to obtain a Rule 6(e) order constituted a flagrant abuse of the grand jury process. Although the court does not agree with the government's contention that the instant transfer was not a "disclosure" within the meaning of Rule 6(e), this sort of violation does not *per se* invalidate an indictment. *See United States v. Malatesta*, 583 F.2d 748, 752–54 (5th Cir. 1978); *United States v. E. H. Koester Bakery Co.*, 334 F.Supp. 377, 381–82 (D.Md.1971). *See also In Re December 1974 Term Grand Jury Investigation*, 449 F.Supp. 743, 744–49 (D.Md.1978) (discussion of 1977 amendments). The evils associated with presenting selected portions of transcripts of testimony are not present in this case, *In Re Grand Jury Investigation of Banana Industry*, 214 F.Supp. 856, 859–60 (D.Md.1963), and defendants have not shown that an interest protected by the policies underlying Rule 6(e) has been prejudiced.

■ The second alleged Rule 6(e) violation concerns a disclosure by Officer West of a DEA investigative synopsis to a representative of the Maryland Attorney General. Assuming that Officer West's disclosure was improper because the Assistant United States Attorney could not have disclosed the information without a Rule 6(e) order, *see United States v. Bazzano*, 570 F.2d 1120, 1125 (3rd Cir. 1977), and assuming further that the synopsis tended to reveal what had transpired in the grand jury room, *see In Re Grand Jury Investigation*, 610 F.2d 202, 216–17 (5th Cir. 1980), defendants would at best be entitled to move for a contempt citation. *See In Re Grand Jury, April 1978, at Baltimore*, 581 F.2d 1103, 1109–10 (4th Cir. 1978), *cert. denied*, 440 U.S. 971, 99 S.Ct. 1533, 59 L.Ed.2d 787 (1979). Dismissal of the indictment with prejudice is inappropriate, because defendants have made no showing that the breach of secrecy resulting from Officer West's disclosure operated to prejudice defendants' right to an unbiased grand jury or seriously impaired their defense on the merits. *See United States v. Thomas*, 593 F.2d 615, 623 (5th Cir. 1979); *United States v. Abrahams*, 466 F.Supp. 552, 558 (D.Mass.1978).

## III. Abuse of the Grand Jury Process

### A. Costello and Its Progeny

The reluctance of federal courts to examine the evidentiary basis of a grand jury indictment is founded upon the Supreme Court's decision in *Costello v. United States*, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956). The issue in *Costello* was whether "a defendant [could] be required to stand trial and a conviction be sustained where only hearsay evidence was presented to the grand jury which indicted him?" 350 U.S. at 359, 76 S.Ct. at 406. In affirming Costello's conviction for a unanimous Court, Justice Black set forth the guiding principle concerning judicial examination of grand jury indictments:

> "If indictments were to be held open to challenge on the ground that there was

inadequate or incompetent evidence before the grand jury, the resulting delay would be great indeed. The result of such a rule would be that before trial on the merits a defendant could always insist on a kind of preliminary trial to determine the competency and adequacy of the evidence before the grand jury. This is not required by the Fifth Amendment. An indictment returned by a legally constituted and unbiased grand jury, like an information drawn by the prosecutor, if valid on its face, is enough to call for trial of the charge on the merits. The Fifth Amendment requires nothing more."

350 U.S. at 363, 76 S.Ct. at 408. Although the holding of *Costello* is limited to indictments based exclusively on hearsay, the Supreme Court in subsequent cases has applied the policies of that decision to bar virtually all attacks premised upon the quality or competency of grand jury evidence.

In *United States v. Blue*, 384 U.S. 251, 86 S.Ct. 1416, 16 L.Ed.2d 510 (1966), the Court reversed the district court's dismissal of an indictment for tax evasion holding: "Even if we assume that the Government did acquire incriminating evidence in violation of the Fifth Amendment, Blue would at most be entitled to suppress the evidence and its fruits if they were sought to be introduced against him at trial." 384 U.S. at 255, 86 S.Ct. at 1419 (footnote omitted). Although the issue of grand jury consideration of "tainted" evidence was not raised in *Blue*, Justice Harlan cited both *Costello* and *Lawn v. United States*, 355 U.S. 339, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958), for the proposition that "in any event our precedents indicate this would not be a basis for abating the prosecution pending a new indictment, let alone barring it altogether." 384 U.S. at 255, n. 3, 86 S.Ct. at 1419, n. 3.

Subsequently, in *United States v. Calandra*, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974), the Supreme Court rejected a grand jury witnesses' contention that the Fourth Amendment's exclusionary rule should apply to grand jury proceedings.

Writing for the Court, Justice Powell reiterated the teaching of prior cases:

"[T]he validity of an indictment is not affected by the character of the evidence considered. Thus, an indictment valid on its face is not subject to challenge on the ground that the grand jury acted on the basis of inadequate or incompetent evidence; or even on the basis of information obtained in violation of a defendant's Fifth Amendment privilege against self-incrimination."

414 U.S. at 344–45, 94 S.Ct. at 618 (citations omitted).

The reason underlying the rule that the grand jury may indict upon illegally seized or incompetent evidence is as follows: "Because the grand jury does not finally adjudicate guilt or innocence, it has traditionally been allowed to pursue its investigative and accusatorial functions unimpeded by the evidentiary and procedural restrictions applicable to a criminal trial." 414 U.S. at 349, 94 S.Ct. at 620. *See also Blair v. United States*, 250 U.S. 273, 282, 39 S.Ct. 468, 471, 63 L.Ed. 979 (1919).

In other words, the grand jury is permitted to consider any evidence bearing upon a defendant's factual guilt, regardless of whether it would be excluded at trial to protect a constitutional right or to deter government misconduct. Most federal courts, therefore, have refused to dismiss an indictment when the challenge was viewed as going primarily to the quality or sufficiency of the grand jury evidence. *See, e. g., United States v. Brown*, 574 F.2d 1274, 1275–77 (5th Cir.) *cert. denied*, 439 U.S. 1046, 99 S.Ct. 720, 58 L.Ed.2d 704 (1978); *United States v. Kennedy*, 564 F.2d 1329, 1335–38 (9th Cir. 1977), *cert. denied sub nom. Meyers v. United States*, 435 U.S. 944, 98 S.Ct. 1526, 55 L.Ed.2d 541 (1978); *United States v. Ruyle*, 524 F.2d 1133, 1135 (6th Cir. 1975), *cert. denied*, 425 U.S. 934, 96 S.Ct. 1664, 48 L.Ed.2d 175 (1976); *Coppedge v. United States*, 311 F.2d 128, 132 (D.C.Cir. 1962), *cert. denied*, 373 U.S. 946, 83 S.Ct. 1541, 10 L.Ed.2d 701 (1963); *United States v. Reilly*, 456 F.Supp. 211, 215–16 (E.D.Pa. 1978); *United States v. Callahan*, 442

F.Supp. 1213, 1218 (D.Minn.1978); *United States v. Kleen Laundry & Cleaners, Inc.*, 381 F.Supp. 519, 523–24 (E.D.N.Y.1974).

In order to remedy perceived grand jury abuses, yet avoid *Costello's* prohibition against examining directly the quality of the evidence presented to the grand jury, federal courts have invoked the "prosecutorial misconduct" doctrine. Although founded primarily upon Justice Black's caveat in *Costello*, that an indictment must be returned by an "unbiased grand jury." 350 U.S. at 363, 76 S.Ct. at 408, the decisions establish no consistent standard for dismissal as they are based on discrete factual situations and employ diverse reasoning.

### B. The Prosecutorial Misconduct Doctrine

The standard for dismissal of an indictment in the Second Circuit was set forth concisely by Judge Timbers in *United States v. Fields*, 592 F.2d 638 (2d Cir. 1978); *cert. denied*, 442 U.S. 917, 99 S.Ct. 2838, 61 L.Ed.2d 284 (1979):

> "The extreme sanction of dismissal of an indictment is justified in order to achieve one or both of two objectives: first, to eliminate prejudice to a defendant in a criminal prosecution; second, to 'help translate the assurances of the United States Attorneys into consistent performances by their assistants.' "

592 F.2d at 647 (footnotes omitted).

In *Fields* the government had appealed the district court's dismissal of substantial portions of a securities fraud indictment, granted due to the alleged misconduct by Securities and Exchange Commission employees in concealing their reference of the case to the United States Attorney while leading defense counsel to believe that the opposite was true. In reversing the dismissal, Judge Timbers noted the absence of prejudice to the defendants and commented: "It is only in the rare case, where it is impossible to restore a criminal defendant to the position he would have occupied vis-a–vis the prosecutor, that the indictment may be dismissed." 592 F.2d at 648. With respect to detering government misconduct, Judge Timbers stated:

> "[P]roper regard for the public interest in the prosecution of crimes counsels restraint in dismissing an indictment for deterrence purposes unless the course of official misconduct is a demonstrated, long–standing one. We have approved this extreme sanction only when the pattern of misconduct is widespread or continuous."

592 F.2d at 648.

The standard articulated in *Fields* was reaffirmed in *United States v. Artuso*, 618 F.2d 192, 196–97 (2d Cir. 1980). In that case the court reversed the district court's dismissal of the indictment, holding that the government conduct, using the defendant's brother as an informer, did not "rise to the level of 'the truly extreme cases' in which dismissal is proper." 618 F.2d at 196. *See United States v. Brown*, 602 F.2d 1073, 1076–78 (2d Cir. 1979) (dismissal of indictment reversed; government's failure to supervise "amoral" paid informer insufficient ground and no showing that government conduct was "widespread or continuous"); *United States v. Broward*, 594 F.2d 345, 351 (2d Cir. 1979) (dismissal of indictment reversed; false testimony by government witness at suppression hearing insufficient misconduct and no showing of "widespread of continuous" official misconduct). Thus, while the Second Circuit has upheld indictment dismissals, *see United States v. Jacobs*, 531 F.2d 87, 90 (2d Cir.), *vacated and remanded*, 429 U.S. 909, 97 S.Ct. 299, 50 L.Ed.2d 277, *affirmed on remand*, 547 F.2d 772 (2d Cir. 1976), *cert. dismissed*, 436 U.S. 31, 98 S.Ct. 1873, 56 L.Ed.2d 53 (1978) (perjury charge dismissed where government failed to follow uniform Circuit practice of informing witness of target status); *United States v. Estepa*, 471 F.2d 1132, 1137 (2d Cir. 1972) (conviction reversed and indictment dismissed when prosecutors failed to heed repeated warnings concerning use of hearsay and grand jury probably would not have indicted if presented with first–hand testimony), and suggested that an intentional withholding of known, exculpatory evidence might warrant dismissal, *see Unit-*

ed States v. Ciambrone, 601 F.2d 616, 623 (2d Cir. 1979), its opinions make clear that "[o]nly in very narrow circumstances is this 'most extreme remedy' appropriate." United States v. Artuso, 618 F.2d at 197. Cf. United States v. Provenzano, 440 F.Supp. 561, 565–66 (S.D.N.Y.1977) (indictment dismissed for failure to disclose to grand jury material exculpatory evidence).

In United States v. Serubo, 604 F.2d 807 (3d Cir. 1979), the Third Circuit indicated an increased willingness to dismiss indictments when the government's conduct is particularly egregious. Reversing the defendants' convictions and remanding the case to the district court to determine whether the misconduct occurring before the first grand jury affected the indictment returned by the second, the court stated:

"We recognize that dismissal of an indictment may impose important costs upon the prosecution and the public. At a minimum, the government will be required to present its evidence to a grand jury unaffected by bias or prejudice. But the costs of continued unchecked prosecutorial misconduct are also substantial. This is particularly so before the grand jury, where the prosecutor operates without the check of a judge or a trained legal adversary, and virtually immune from public scrutiny. The prosecutor's abuse of his special relationship to the grand jury poses an enormous risk to defendants as well. For while in theory a trial provides the defendant with a full opportunity to contest and disprove the charges against him, in practice, the handing up of an indictment will often have a devastating personal and professional impact that a later dismissal or acquittal can never undo. Where the potential for abuse is so great, and the consequences of a mistaken indictment so serious, the ethical responsibilities of the prosecutor, and the obligation of the judiciary to protect against even the appearance of unfairness, are correspondingly heightened.

"We suspect that dismissal of an indictment may be virtually the only effective way to encourage compliance with these ethical standards, and to protect defendants from abuse of the grand jury process."

604 F.2d at 817.

The prosecutor in Serubo did the following: (1) he attempted to associate the defendants, without evidentiary basis, with organized crime; (2) he referred to loan-sharking charges against persons with whom he was trying to link the defendants without informing the grand jurors that such persons had been acquitted; (3) he impugned the testimony of witnesses who failed to link the defendants with organized crime; and (4) he commented unfavorably on the veracity of witnesses and badgered those who were uncooperative. 604 F.2d at 815.

The Serubo court distinguished two prior Third Circuit cases in which the indictments had been upheld, notwithstanding prosecutorial misconduct, on the "ground that since 'an abundance of competent evidence' supported the indictment, the prosecutor's misconduct could not have had any material effect on the grand jury's decision to indict." 604 F.2d at 816–17. See United States v. Riccobene, 451 F.2d 586, 587 (3d Cir. 1971) (prosecutor told grand jury that a crucial witness would not testify because he feared the defendants who were "connected with organized crime and could harm him"); United States v. Bruzgo, 373 F.2d 383, 384–87 (3d Cir. 1967) (prosecutor called witness a thief and a racketeer, inspiring the grand jurors to hiss, and openly threatened him with loss of citizenship and imprisonment). However, when Serubo is analyzed along with United States v. Birdman, 602 F.2d 547 (3d Cir. 1979), the analysis suggests that the Third Circuit may now be inclined to dismiss indictments, even absent a showing of prejudice by the defendant, when the government's conduct " 'was anything but an isolated incident unmotivated by sinister ends,' " or that "the type of misconduct challenged has become 'entrenched and flagrant.' " 604 F.2d at 817. See also United States v. Weingartner, 485 F.Supp. 1167, 1175–76 (D.N.J.1979).

The Ninth Circuit recently addressed the issue of prosecutorial misconduct in *United States v. Samango*, 607 F.2d 877 (9th Cir. 1979), where it affirmed the district court's dismissal of a superseding indictment. The court based its affirmance on the government's use of lengthy transcripts of testimony from a prior grand jury when it could have presented live witnesses. In affirming the dismissal, the court noted that the indictment was not dismissed on the ground of insufficient or incompetent evidence; rather, the issue was whether "the prosecutor's behavior was so improper and prejudicial that it created a biased grand jury." 607 F.2d at 881. Although declining to rule on the defendant's Fifth Amendment claim, the court held that "the manner in which the government obtained the indictment represented a serious threat to the integrity of the judicial process," thereby justifying the exercise of the court's supervisory powers. 607 F.2d at 885. *Cf. United States v. Chanen*, 549 F.2d 1306 (9th Cir.), *cert. denied*, 434 U.S. 825, 98 S.Ct. 72, 54 L.Ed.2d 83 (1977) (use of transcripts rather than live witnesses permissible where grand jury was alerted to credibility problem and court was certain they had received the information contained in the transcripts). *See also United States v. Basurto*, 497 F.2d 781 (9th Cir. 1974) (due process violated where government knew indictment was based upon perjured testimony).

The Fifth Circuit has indicated that an indictment may be dismissed when the government knowingly presents perjured testimony to the grand jury, or if a prosecutor's inflammatory statements result in the jurors voting to indict based on their bias. *United States v. Cathey*, 591 F.2d 268, 272–74 (5th Cir. 1979). Furthermore, several district courts in the Fifth Circuit have dismissed indictments when confronted with serious government misconduct. In *United States v. Braniff Airways, Inc.*, 428 F.Supp. 579, 582–83 (W.D.Tex.1977), the court dismissed an antitrust indictment based on its finding that unauthorized persons were present in the grand jury room. *Accord, United States v. Bowdach*, 324 F.Supp. 123, 124 (S.D.Fla.1971). In *United States v. Treadway*, 445 F.Supp. 959, 962–64 (N.D.Tex.1978), the court ordered dismissal because a government attorney testified on a material matter and then remained in the grand jury room as the presenting attorney. In *United States v. Martin*, 480 F.Supp. 880, 886 (S.D.Tex.1979), the court dismissed a securities fraud indictment where the SEC violated its promise not to refer the case to the United States Attorney for criminal proceedings, and the prosecutor withheld important evidence from the grand jury, preventing it from returning an informed and independent indictment.

## C. The Appropriate Remedy

The Fifth Amendment guarantees that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury." The Supreme Court has emphasized repeatedly that this "constitutional guarantee presupposes an investigative body 'acting independently of either prosecuting attorney or judge.'" *United States v. Dionisio*, 410 U.S. 1, 16, 93 S.Ct. 764, 772, 35 L.Ed.2d 67 (1972), *quoting Stirone v. United States*, 361 U.S. 212, 218, 80 S.Ct. 270, 273, 4 L.Ed.2d 252 (1960). The grand jury can fulfill its historic function of safeguarding a defendant's Fifth Amendment rights only if it is "an independent and informed grand jury." *Wood v. Georgia*, 370 U.S. 375, 390, 82 S.Ct. 1364, 1373, 8 L.Ed.2d 569 (1962). Its responsibilities include "both the determination whether there is probable cause to believe a crime has been committed and the protection of citizens against unfounded criminal prosecutions." *United States v. Calandra*, 414 U.S. at 343, 94 S.Ct. at 617, *citing Branzburg v. Hayes*, 408 U.S. 665, 686–87, 92 S.Ct. 2646, 2659, 33 L.Ed.2d 626 (1972).

Further, as Mr. Justice Sutherland noted in *Berger v. United States*, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935), a federal prosecutor has special responsibilities:

"The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as

compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor–indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one."

295 U.S. at 88, 55 S.Ct. at 633.

■ The facts of this case demonstrate unequivocally that the prosecutor did not maintain this necessarily high standard of conduct. Particularly egregious was his examination of Robert Sampson on August 1, 1979, before the indicting grand jury. By intentionally and repeatedly asking misleading questions, while failing to disclose known, exculpatory evidence on the issue of Lawson's guilty knowledge, the prosecutor denied defendants their constitutional right to an "unbiased" grand jury. *Costello v. United States*, 350 U.S. at 363, 76 S.Ct. at 408. Prejudice of this order cannot be eliminated at trial, and the court will not speculate that the grand jurors' decision might have been unaffected by the prosecutor's conduct. Therefore, the indictment against defendants Lawson and Lane must be dismissed. *United States v. Serubo*, 604 F.2d at 817; *United States v. Fields*, 592 F.2d at 647.

■ Nevertheless, the court concludes that the dismissal should be without prejudice. Although defendants do have a constitutional right to an informed and unbiased grand jury, they have no concomitant right to bar forever investigation into their alleged criminal conduct. While outrageous government conduct could taint evidence irrevocably, or prejudice a defendant's case on the merits such that notions of due process and fundamental fairness would preclude reindictment, *see United States v. Russell*, 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1642–43, 36 L.Ed.2d 366 (1973), questioning a grand jury witness in a harassing manner or prejudicing a grand jury with inflammatory remarks is generally curable. Thus, most federal courts that have dismissed indictments due to prosecutorial misconduct in the grand jury room have done so without prejudice to subsequent reindictment. *See, e. g., United States v. Gold*, 470 F.Supp. 1336 (N.D.Ill.1979); *United States v. Asdrubal–Herrera*, 470 F.Supp. 939 (N.D.Ill.1979); *United States v. Carcaise*, 442 F.Supp. 1209 (M.D.Fla.1978); *United States v. Provenzano*, 440 F.Supp. 561 (S.D.N.Y.1977); *United States v. Phillips Petroleum Co.*, 435 F.Supp. 610 (N.D. Okl.1977). *But see United States v. Roberts*, 481 F.Supp. 1385 (C.D.Cal.1980); *United States v. Banks*, 383 F.Supp. 389 (D.S.D. 1974).[10]

■ Significantly, the remand in *Serubo* indicates that the better view is to allow reindictment upon dismissal if the new grand jury would not be affected by the prior government improprieties. 604 F.2d at 818–19. Here, there has been no showing that the actual evidence against the defendants is tainted irrevocably, or that there exists in this District a pattern of prosecutorial misconduct that is "widespread or continuous." *United States v. Fields*, 592 F.2d at 648. The grand jury misconduct about which defendants rightly

---

**10.** Other cases cited by defendants are inapposite. *United States v. Morrison*, 602 F.2d 529 (3d Cir. 1979), involved deliberate government interference with the attorney–client relationship. In *United States v. Fields*, 475 F.Supp. 903 (D.D.C.1979), the indictment was returned for the sole purpose of persuading the defendant to cooperate with the government and without reasonable belief that there was sufficient evidence to convict. *United States v.*

*Dahlstrum*, 493 F.Supp. 966 (C.D.Cal.1980), concerned an application of *United States v. LaSalle National Bank*, 437 U.S. 298, 98 S.Ct. 2357, 57 L.Ed.2d 221 (1978), to a criminal tax investigation and did not involve alleged grand jury abuse. To the extent that any of these cases would suggest a result different from the one reached herein, the court respectfully declines to follow its reasoning.

complain was the product of a single Assistant United States Attorney, who is no longer associated with the case. While the court in no way condones his conduct, in balancing the deterrent objectives of dismissal with prejudice against society's interest in the prosecution of those who violate its laws, the court concludes that it should not forever bar the government from prosecuting the defendants.

Defendants have urged that the court consider the other improprieties connected with this case as militating against dismissal without prejudice. They assert that the "cumulative effect" of these improprieties operates to outweigh any societal interest in prosecuting defendants in favor of the interest of the defendants and the public in the fair administration of justice. Additionally, defendants contend that to permit the government to reindict defendants would eliminate any deterrent effect of the dismissal, as well as any government incentive to guard against grand jury abuse.

The court cannot agree with defendants' assertions. Although wholly improper, these additional improprieties, even taken together, do not rise to the level of a constitutional violation, and have not prejudiced defendants' case on the merits. *See United States v. Campagnuolo*, 592 F.2d 852, 865 (5th Cir. 1979); *United States v. Owen*, 580 F.2d 365, 367–68 (9th Cir. 1978); *United States v. Baskes*, 433 F.Supp. 799, 804–07 (N.D.Ill.1977). While defendants are entitled to the remedy of dismissal for violations of their constitutionally protected rights, they are not entitled to the reward of permanent immunity respecting their alleged criminal conduct. Under the circumstances of this case, the costs to society are simply too high.

As for deterring future prosecutorial misconduct and preserving the integrity of the judicial process, the court is confident that prosecutors in this District will not be likely to engage in future improprieties. Further, they have now been forewarned. To the extent that this court does have supervisory power to dismiss the indictment with prejudice, the court, in its discretion, declines to exercise that power in this case.

It is, therefore, this 8th day of October, 1980, ORDERED that the Indictment against the defendants be, and it hereby is, DISMISSED WITHOUT PREJUDICE.