*709 OPINION OF THE COURT
Alan Broomer, J.
This case is before me for the third time. Originally, on December 7, 1983 I presided over a combined Mapp and Huntley hearing; the motions to suppress were denied (opn filed Jan. 10, 1984). The case was then tried before the Honorable Julius Vinik and a jury, resulting in a conviction on March 20, 1984. Before the defendant was sentenced, the Appellate Division decided People v Pace (101 AD2d 336, affd 65 NY2d 684). Relying on the appellate decision in Pace, the defendant sought reargument of the denial of his suppression motion. Reargument was granted, and after due consideration, I declined to disturb my original ruling.
On July 12, 1984 the defendant was sentenced. On appeal to the Appellate Division, decision was held in abeyance, the matter was remitted to Criminal Term for a reopened suppression hearing at which "a full examination of Sgt. Tabron” would be conducted.[1] That hearing has been held; Sgt. Tabron was the only witness called. Indeed, his testimony is the sole addition to the record (Feb. 7, 1986).[2]
THE FACTS
The opinion after the first hearing (filed Jan. 10, 1984) fully sets forth the facts and reflects in its inception, a completely unexceptional routine, administrative junkyard inspection. Sgt. Tabron’s testimony taken pursuant to the Appellate Division’s direction, while expanding the record, contributes nothing that disturbs my earlier findings; if anything, his testimony reinforces them.
Sgt. Charles Tabron testified that his inspection of the defendant’s auto junkyard on January 5, 1983 was one of hundreds he has conducted in the almost four years he was assigned to the Auto Crime Unit. He and his team went to the defendant’s premises to conduct an administrative inspection, *710 i.e., to inspect licenses, records and to regulate the industry. He selected defendant’s establishment from among several in the Preston Court area after he checked police reports and ascertained that the premises had not been inspected recently by any other team. Had the premises been recently inspected he would not have conducted the inspection. Prior to planning and embarking on the inspection, he had no prior knowledge of any criminality at the yard. He did not discuss his destination with his team; they remained ignorant of their destination until they went into the premises.
After the team had been in the yard for 30 minute to an hour, one of the members told Sgt. Tabron that a uniformed police officer had arrested someone for possession of a stolen automobile engine that had possibly been obtained from the defendant’s yard.
I find Sgt. Tabron to be a credible witness and adopt his testimony as part of my finding of facts.
DEFENDANT’S ARGUMENT
Defendant argues that Sgt. Tabron’s receipt of the information that on a prior occasion a uniformed police officer had arrested someone for possession of a stolen engine that may have come from the defendant’s yard, required that the police immediately suspend their administrative inspection, leave the yard after securing the premises and immediately obtain a search warrant.
THE LAW
Quite apart from the fact that the information regarding a stolen engine was too stale to support the issuance of a search warrant, substantively such information hardly rises to the level of probable cause. At best it would make a reasonably prudent police officer suspicious that perhaps this defendant had sold a stolen engine in the past. As will appear from the discussion below, such suspicion is of little to no legal significance.
The US Constitution 4th Amendment protects all places wherein their occupiers have legitimate and reasonable expectations of privacy from unreasonable governmental intrusions. The government may not enter premises to gain evidence of criminal activity unless it has first obtained a search warrant supported by probable cause.
Where the government seeks entrance to private premises *711 to conduct inspections to insure compliance with health and fire regulations, a relaxed standard will support the issuance of an appropriate warrant, i.e., that the inspection is justified by a reasonable governmental interest (Camara v Municipal Ct., 387 US 523).
The administrative warrant may not be used to gather evidence of crimes but solely to further appropriate regulatory interests. As soon as the purpose for entry upon premises shifts from administrative or regulatory to one of gathering evidence for a criminal prosecution, the authorities must obtain a conventional search warrant based on probable cause (Michigan v Tyler, 436 US 499).
However, there are certain industries that require intensive and regular governmental oversight. Their practices are so fraught with criminality or danger, it is reasonable, indeed prudent government requires, that they be closely regulated and inspected to insure compliance with health, fire, safety and reasonable regulatory laws to insure that they do not become dangers, menaces or nuisances to the general community. The Supreme Court has upheld warrantless entries upon the premises of "pervasively regulated” or "closely regulated” businesses and industries (United States v Biswell, 406 US 311, 316; Colonnade Corp. v United States, 397 US 72). Indeed some businesses, liquor, bars, hazardous chemicals, explosives and firearms have had a long history of governmental regulation and oversight. Understandably any entrepreneur embarking upon such a business accepts the burdens with the benefits and voluntarily subjects himself to plenary and intrusive governmental regulations. He has no reasonable expectation of privacy. (Marshall v Barlow’s, Inc., 436 US 307). This does not mean that the 4th Amendment’s benefits are denied him. It is still a bar to a trespassing police officer seeking evidence of criminality without an appropriate search warrant (See v City of Seattle, 387 US 541). When an entrepreneur embarks upon a closely regulated business, he tacitly consents to entry by the authorities upon his premises for the purposes of inspection and enforcement of valid regulatory schemes (Almeida-Sanchez v United States, 413 US 266). New York (along with many other States) has long licensed and regulated the junk industry. Automobile dismantlers are part of both the junk and automobile repair industries. While both industries have honest practitioners, many junkyards, body shops and dismantlers are little more than fronts or essential elements of stolen car rings and insurance fraud schemes.
*712 Vehicle and Traffic Law § 415-a authorizes the entry into a junkyard or auto dismantler’s premises for the purpose of inspecting its books and records, and any parts or inventory that are subject to record keeping. In the City of New York, New York City Charter § 436 authorizes the Police Commissioner to exercise general powers of supervision and inspection over all junk shops and dealers in secondhand merchandise. To carry out his duties under the statute, the Commissioner is given the power to examine their books, business premises and any merchandise in their possession. An inspection must be limited to enforcing the regulatory scheme; entry must be peaceful and during business hours (People v Rizzo, 40 NY2d 425).
The defendant contends that the police did not conduct an administrative inspection but sought to gather evidence of crimes to be used against him in a criminal prosecution. Since they were acting as law enforcement officers, not as regulators, their warrantless entry was per se unreasonable and the entire fruits of their inspection should be suppressed.
DISCUSSION
People v Pace (101 AD2d 336, 340) provides that where "a search is not undertaken as a routine regulatory inspection, the administrative search rationale is simply inapplicable”. In Pace (supra) two police officers entered the defendant’s yard and asked to see the " 'police book’ ” (supra, p 337). When told that the book had been stolen, they began to survey the yard expressly to look for stolen engines and other parts. Their interest in the yard was stimulated earlier by apprehending one Sylvester Pace operating a truck unlawfully and transporting a car lacking the appropriate vehicle identification number (VIN) plate that he had just "found” on Flat-lands Avenue. While they were questioning Pace, another truck carrying two front ends of late model cars was intercepted by them after it had left Pace’s yard.
Concededly, in Pace (supra) the officers clearly believed they had uncovered a criminal operation and entered Pace’s yard for the purpose of ferreting out evidence of further criminality, i.e., stolen auto parts. They entered under the aegis of regulation but their actual purpose was not regulation but evidence gathering. Since they lacked a search warrant, what they discovered had to be suppressed.
As authority for its holding, the Pace court (supra) cites *713 United States v Russo (517 F Supp 83), United States v Lawson (502 F Supp 158) and United States v Anile (352 F Supp 14).
In Lawson (502 F Supp 158, supra) the issue is clearly drawn. There the Government frankly asserted its right under the Drug Control Act to use administrative warrants to gather evidence of criminal conduct. The court found the argument untenable "once the purpose behind the search shifts from administrative compliance to a quest for evidence to be used in a criminal prosecution, the government may constitutionally enter the premises only upon securing a warrant supported by full probable cause” (supra, p 165, citing Michigan v Tyler, supra).
Russo (supra) is equally clear cut. There, agents of the Drug Enforcement Administration had considerable information regarding Dr. Russo’s trafficking in controlled substances, including sales to undercover officers, a substantial sale to a civilian who was arrested as soon as he left the doctor’s office, receipt of substantial drug shipments and for a week prior to their entry they had Russo’s office under constant surveillance. Even though the agents contended that at the time of their entry pursuant to an administrative warrant, no decision had yet been made to prosecute, the court had little trouble finding that the administrative warrant was procured for the primary purpose of seizing evidence for a criminal prosecution.
Lawson, Russo and Pace (supra) represent clear instances of situations that commenced as inquiries into criminal conduct, matured as the authorities gathered increasingly inculpatory information and culminated in "administrative” entries to gather more evidence to support criminal prosecutions.
Anile (352 F Supp 14, supra) is not clear cut. Arguably, the case could easily have gone the other way. Anile was a pharmacist. Drug Enforcement agents entered his drugstore to conduct an administrative inspection; it carried over to the next day. Subsequently, they returned five weeks later and conducted another inspection. As a result of discrepancies in his narcotics records, Anile was arrested the following month. The court found that the inspection was prompted by complaints about Anile’s activities (not set forth in the record before the court). Extrapolating from this "finding”, the court found that the complaints "apparently raised serious questions in the minds of the authorities” (supra, p 17). The court *714 concluded "[tjhere can be no doubt that they were the sole reason for the agent’s initial visit to defendant’s business and the attendant inspection of his records. It would seem reasonable, therefore, to expect a trained investigator to recognize that the possibility of criminal prosecution was great under these circumstances.” (Supra, p 17.) Wisely, the court pulled back a bit when it observed that "suspicion does not convert an administrative investigation into a traditional criminal investigation. The problem is, of course, one of degree.” (Supra, p 18.)
The difference between the two searches is not so much one of degree but of kind. The problem is exacerbated by the fact that the same agent wears two hats. In New York, the police enforce both the Penal Law and administer the regulatory scheme. On the Federal side, agents of the Drug Enforcement Administration enforce the criminal drug laws and also inspect doctors and pharmacists for compliance with regulatory schemes.
The trier of the facts must decide which hat the agent was wearing when he entered a particular premises. If separate agencies discharged the two functions, the problem would all but vanish (absent a silver platter or cat’s paw situation).
The Anile court (supra) mistakenly elevated "suspicion” in the mind of the investigator into a controlling factor. Pointedly, it is unrealistic not to believe that the agents will usually be "suspicious” in administering the regulatory scheme. Indeed, the law provides for inspections because the particular industries themselves have been rife with corruption and opportunity for criminality (see, People v Tinneny, 99 Misc 2d 962). Why else are such industries "pervasively regulated”? Moreover, it would be woeful constitutional law to exempt from regulation those purveyors who most needed it, i.e., those suspected of noncompliance or dishonesty. It takes little imagination to conceive of how easily Anile (supra), if it correctly states the law, could confer immunity from administrative inspections upon those who regard them as nuisances or worse. An anonymous letter or two (self-generated) complaining of criminal activities at a particular location is all that is required. Should a later administrative inspection disclose evidence of criminality, "discovery” of those letters in the defendant’s agency file will suffice to tip the decision in the defendant’s favor, i.e., the inspection was criminal in nature following the Anile rationale (supra).
*715 The use of the word "routine” regulatory inspection may be troubling also. It raises the "pure heart empty-headed” policeman spectre. It cannot mean the only premises subject to valid inspection are those selected at random from a dartboard, a hat or a wheel. The whole purpose of the regulatory scheme is to keep the regulated industry honest. This purpose is best realized by subjecting the regulated to surprise inspections. (See, Matter of Glenwood TV v Ratner, 65 NY2d 642, 644; United States v Biswell, 436 US, at p 316.) Experience will teach the regulators that some entrepreneurs must be inspected often, others infrequently and some only rarely. Obviously once the regulators have specific information of ongoing criminality and they desire to gather evidence to further a criminal prosecution, they must procure a search warrant. Vague suspicions of criminality should not confer immunity from regulatory inspections upon the subject premises. All premises, shady ones and clean ones, should be treated alike and subject to bona fide regulatory inspections.
Suspicion in the mind of an officer should never be cause to invalidate an administrative inspection. General suspicion that something may be awry is always in the mind of an inspecting official, but so is the hope that all will be in order, that indeed the legislative scheme is working. Even focused suspicion should not vitiate a bona fide inspection. Were it to do so, an unintended immunity from all inspections would be conferred on its objects, thus standing the statute’s purpose on its head. Those who need monitoring most would have to be ignored; those who don’t need it would be inspected constantly. (The regulators will continue to regulate.) A better touchstone than suspicion is needed. One is at hand: Purpose.
Where the object of the entry is inspection, the result is unexceptional. An entry is either good or bad at its inception. It cannot be validated or voided by what it discloses.
Where the object of the entry is to gather evidence of crime, to further an ongoing criminal investigation of a target or to circumvent the need for a conventional warrant and it is made under the guise of an administrative inspection, it is improper.
The litmus is purpose. Which hat was the officer wearing, administrative or policeman’s?
I find the subject inspection to have been just that, a routine regulatory inspection. Before entering the yard, the officers did not see any criminal conduct therein nor did they know of *716 any in the past. It was only during their routine inspection that some vague information came to the Sergeant’s attention that someone (?) had been arrested previously by a uniformed officer in a neighboring precinct, for possession of a stolen engine that might have come from the defendant’s yard. Such information is so lacking in specificity that it could not be used to obtain a search warrant. Legally it has the same significance as gossip — none.
CONCLUSION
The entry into the defendant’s junkyard was made in the course of enforcing Vehicle and Traffic Law § 415-a and New York City Charter § 436. The members of the Auto Crime Division had no significant knowledge of criminality in the subject premises and were not using the inspection as a ruse to gather such evidence. All of the evidence gathered was obtained lawfully and may be used against the defendant. His motions to suppress are denied.

. Defendant was not deprived of an opportunity to call Sgt. Tabron or any other witness upon the first reopening. He never sought to adduce additional testimony, choosing to rely solely on the recently decided People v Pace case (101 AD2d 336, affd 65 NY2d 684).

. In his most recent memorandum, counsel alludes to certain trial testimony never offered or adduced at the hearing. He even appended a transcript to his memorandum of law. This practice has been condemned by the Appellate Division and accordingly such testimony is not part of the hearing record. (See, People v Wilkerson, 108 AD2d 831.)