[No. E002393. Fourth Dist., Div. Two. Dec. 9, 1986.]

THE PEOPLE, Plaintiff and Respondent, v.
BYRON JOSEPH SWAN, Defendant and Appellant.

COUNSEL

Christopher Blake, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, and Steven H. Zeigen, Deputy Attorney General, for Plaintiff and Respondent.

OPINION

KAUFMAN, Acting P. J.—In a twenty-two count amended information filed May 17, 1985, defendant Byron Joseph Swan was charged with nine counts of robbery, six counts of forcible oral copulation, four counts of rape, and three counts of kidnapping. The information further alleged each offense was committed through the personal use of a firearm within the meaning of Penal Code section 12022.5.[1] Prior convictions of robbery, burglary, aggravated assault, and theft of a motor vehicle were also alleged.

Defendant entered a plea bargain under which he pled guilty to all counts in the information. The court sentenced defendant to the 65-year term stipulated in the plea bargain and defendant now appeals, contending (1) the court erroneously refused to exclude evidence obtained through the improper service of a nighttime search warrant and (2) his 65-year sentence is not commensurate with his culpability and therefore constitutes cruel and unusual punishment.

*Factual and Procedural Background*

On September 22, 1984, Susan P. and Donald S. picnicked in the San Juan Campground of the Cleveland National Forest in Riverside County. Defendant accosted them while armed with a gun. He robbed each of their

---

[1] All further statutory citations will refer to the Penal Code unless otherwise noted.

money and took Susan's jewelry. He also raped Susan and forced her to perform an act of oral copulation upon him.

On October 7, 1984, Jack P., his wife Susannah, and their minor daughter Melody Ann, were having lunch in a secluded area near the San Juan Campground. Defendant approached them wearing a nylon stocking mask and carrying a gun. He robbed them of their jewelry and money and forced the parents to lie on the ground. He took Melody Ann a short distance away and forced her to perform an act of oral copulation upon him.

On October 14, 1984, Marinette J. and Gloria B. were hiking in the San Juan Campground when defendant confronted them while armed with a gun. He robbed them of their jewelry and then forced them off the hiking trail. He forced each of them to orally copulate him and attempted to sodomize them. He also attempted to rape Gloria, apparently making some penetration.

On October 20, 1984, Ronald C., his wife Jocelyn, and their two young children stopped for lunch near the San Juan Campgrounds. After lunch, they walked down to a creekbed so the children could play in the sand. Defendant approached them wearing a nylon stocking mask and armed with his gun. He demanded their money and jewelry and forced them to follow the creekbed further off the roadway. He then took Mrs. C. a short distance from the rest of the family and forced her to perform an act of oral copulation upon him.

Defendant was arrested on October 21, 1984. When arrested defendant had in his possession a men's watch which was later identified as the one stolen from Jack P. Also in his possession were names and addresses of jewelry dealers.

Riverside Sheriff's Detective Donald Farrar was assigned to the case. Shortly after 9 p.m. on October 21, 1984, Farrar joined Riverside Deputy District Attorney Joe Hernandez and Judge Gerald Pendleton of the Corona Municipal Court in a three-way phone conversation in order to obtain a telephonic warrant to search defendant's residence. Farrar was sworn as an affiant. Farrar proceeded to describe in detail the charges against defendant and the items taken from each victim. He stated his belief that, in view of the fact that defendant possessed the watch stolen from Jack P. and the list of jewelers, it was likely defendant had not yet pawned the items taken from the more recent victims. Farrar also described in detail the location and appearance of defendant's residence. He requested that the search warrant include permission to locate the items stolen from the victims, the clothing worn by defendant during the incidents, nylon stocking masks used, the

gun, and any pawnshop tickets or deposit slips referring to stolen items. Late during the three-way conference call, the following exchange took place:

"HERNANDEZ: This is Joe Hernandez again. Explain the need for night time service. What is the emergency which would prevent us from waiting until tomorrow. [¶] FARRAR: Well, it is believed that the subject has advised that he does live with other people and it is believed that he may phone these people and they may attempt to destroy or take away the evidence which we are seeking. [¶] HERNANDEZ: This is Joe Hernandez again. Judge do you have any questions? [¶] PENDLETON: No, I—This is Judge Pendleton. It appears to me there is probable cause to issue a search warrant as requested an [sic] also that it might be served at night time. Due to the circumstances." Judge Pendleton later stated: ". . . Detective Farrar you are authorized to sign my signature on the original of the search warrant." The time of the warrant was designated as 9:50 p.m.

The following exchange then took place: "HERNANDEZ: Now judge, may I ask you to direct Detective Farrar to sign your initials at the place where it says good cause being shown this warrant may be served at any time of the day or night as approved by my initials and I'm going to ask you to direct Detective Farrar to put your initials there and then by Detective Donald Farrar. [¶] PENDLENTON [sic]: Alright [sic] would you—uh, this is Judge Pendleton—Detective Farrar if you sign the declaration and the search warrant with my initials by yourself. [¶] FARRAR: I am signing the duplicate original or initialling the duplicate original where it says good cause being shown this warrant may be served at any time of the day or night as approved by my initials CFP by Don Farrar. [¶] PENDLETON: That's ah, thats [sic] down, that's fine."

In the meantime, Riverside County Deputies Soltz and Thurber waited outside defendant's residence for the arrival of the search warrant from Detective Farrar. They had been there all evening since arriving shortly before 8 p.m. to obtain a description of the residence for the search warrant. Shortly before 11 p.m., Soltz and Thurber saw a car enter the garage of defendant's residence and watched the driver go into the house. The officers knocked on the front door and defendant's mother, Rose Marie Swan, answered. The detectives advised her that her son had been arrested for several robberies. After showing Mrs. Swan their identification, the two detectives accepted her invitation to come into the house and sit down.[2] Once inside the house, without providing any details about the evidence sought, Soltz and Thurber informed Mrs. Swan they wanted to search her

---

[2]Mrs. Swan testified that her motivation in inviting the officers into her home was ". . . because I didn't want the neighbors to come out and see what was going on . . . ."

house. She refused to permit a search without a warrant. Soltz and Thurber informed her they would return after obtaining the search warrant and then left. Mrs. Swan also left to drive to a phone booth, because her phone was broken. Apparently the phones to which she drove were among the only ones in the vicinity, because she and the detectives again met each other at the phones.

Mrs. Swan called her daughter and asked that she come immediately to the residence. A short time later Mrs. Swan met her daughter, her son-in-law and their children at the residence. Detective Soltz testified at the suppression hearing that both Mrs. Swan and her daughter agitatedly and forcefully declared their intention to enter the residence. Mrs. Swan testified she asked her daughter to visit at the late hour because she was so upset at the news of her son's arrest.

Detectives Soltz and Thurber evidently communicated to Farrar the events which had transpired at defendant's residence. Farrar then telephoned Judge Pendleton, seeking an addendum to the search warrant. He reported the address on the search warrant was correct and had been confirmed by a registration check on defendant's motorcycle. Farrar went on to state: "Also additional cause for the service at nighttime of the warrant is that the co-resident, Rose Swan, was contacted by Detective Soltz at 2300 hours and Rose Swan, at this time is demanding entrance into the residence and [Soltz] is fearful that evidence of the crime which is being sought will be destroyed." Judge Pendleton stated: "An extingency [*sic*] certainly does exist." He directed the warrant to be reissued and then restated: "And it is for night time service and extingency [*sic*] certainly exists."

The warrant was subsequently served shortly after midnight (12:01 a.m. on Oct. 22, 1984) and numerous items of jewelry identified by the victims, a .38 caliber revolver, and articles of defendant's clothing were seized.

The court held a hearing on defendant's section 1538.5 motion to suppress the evidence obtained at his residence on the ground there was an insufficient showing to Judge Pendleton that a nighttime search was justified. Prior to any testimony, the court ruled in defendant's favor that there was insufficient justification for authorizing nighttime service of the search warrant. The court concluded there was insufficient information provided to support a reasonable inference the evidence sought would be concealed or destroyed before 7 a.m. the next morning when the search warrant could properly be served. However, after hearing the testimony of Detective Soltz and Mrs. Swan, the court found under *United States* v. *Leon* (1984) 468 U.S. 897 [82 L.Ed.2d 677, 104 S.Ct. 3405] that the detectives operated in good faith

when they served the search warrant at night and that, therefore, exclusion of the seized evidence was not required.

*Discussion*

1. *Nighttime Service*

Section 1533 provides: "Upon a showing of *good cause,* the magistrate may, in his discretion, insert a direction in a search warrant that it may be served at any time of the day or night. In the absence of such a direction, the warrant shall be served only between the hours of 7 o'clock a.m. and 10 o'clock p.m." (Italics added.)

The court essentially found the showing made to Judge Pendleton by Hernandez and Farrar did not constitute good cause and thus nighttime service of the search warrant was improperly authorized. Of course, defendant does not take issue with the court's determination in this regard, because it resolved the question in his favor. Neither does he attack the telephonic procedure used to procure the search warrant. Defendant only challenges the court's conclusion that suppression of the evidence seized after 10 p.m. was not required because the deputies involved relied in good faith on the nighttime search provision in the warrant.

"We begin with the fundamental premise that a search of a person's home is a drastic intrusion upon the personal rights of the homeowner." (*People* v. *Watson* (1977) 75 Cal.App.3d 592, 595 [142 Cal.Rptr. 245].) ██ The requirement that nighttime service of search warrants cannot proceed absent a showing of good cause therefor to a neutral magistrate evinces a legislative determination that such searches are "peculiarly intrusive" upon the rights of homeowners. (See *Rogers* v. *Superior Court* (1973) 35 Cal.App.3d 716, 720 [111 Cal.Rptr. 9].)

██ We observe that the harm normally attendant to improper nighttime service of a search warrant was considerably mitigated in this case when, at a time well after 10 p.m., defendant's mother invited the police into her home. While her consent to entry did not signify a consent to search, the concerns in section 1533 weighing against unreasonable nighttime intrusions were nonetheless minimized when Mrs. Swan allowed the policemen into her home at 11 p.m. and was informed they would return shortly with a search warrant. Although these considerations are somewhat tangential to the court's finding that nighttime service was unjustified, the circumstances of the police's original entry into the residence are relevant to the determination whether the officers acted in good or bad faith in effecting nighttime

service and, thus, whether suppression of the seized evidence was correctly denied.

Moreover, it is questionable whether, after Proposition 8, relevant evidence seized pursuant to a search warrant which is defective only as to the nighttime service element is suppressable under an exclusionary rule.[3] Under Proposition 8 courts are constrained from creating new exclusionary remedies for violations of federal or state constitutional provisions, except to the extent that exclusion remains federally compelled. (See *In re Lance W.* (1985) 37 Cal.3d 873, 886-887 [210 Cal.Rptr. 631, 694 P.2d 744].) However, "The requirement of 'good cause' for nighttime service of a search warrant . . . is essentially a statutory requirement imposed by the Legislature and not a constitutional requirement. (See, e.g., *Gooding* v. *United States* (1974) 416 U.S. 430 [40 L.Ed.2d 250, 94 S.Ct. 1780], wherein the U.S. Supreme Court treated the question of 'nighttime' service of search warrants solely as one of statutory interpretation and not as a Fourth Amendment issue.)" (*People* v. *Glass* (1976) 56 Cal.App.3d 368, 372 [128 Cal.Rptr. 413].) Because exclusion of evidence seized in violation of nighttime service requirements does not appear to be compelled under federal law, or under section 1533 itself, the viability of the exclusionary rule urged by defendant is questionable.

■ However, even if suppression of evidence seized pursuant to an unjustified order for nighttime service is permissible after Proposition 8, we conclude the trial court's determination under the *Leon* good faith standard that the evidence should not be suppressed was correct. Although the facts of the *Leon* case involved the issue of probable cause for search warrants and not nighttime service, the good faith reliance concept is not limited to the issue of probable cause. This court, for example, has recently held the *Leon* rationale applicable to another procedural aspect of searches involving police reliance on facially valid court directives. (See *People* v. *Barbarick* (1985) 168 Cal.App.3d 731, 737-740 [214 Cal.Rptr. 322], involving a search condition to a defendant's release upon his own recognizance pending appeal.) Accordingly, we find appropriate the lower court's application of the good faith standard in the instant case.

In *United States* v. *Leon, supra,* 468 U.S. 897 [82 L.Ed.2d 677, 104 S.Ct. 3405], the Supreme Court held that the exclusionary rule should not be applied when an officer conducting a search objectively relies in good

---

[3]Proposition 8 added section 28, subdivision (d), to article I of the California Constitution, which provides in relevant part: "Right to Truth-in-Evidence. Except as provided by statute hereafter enacted by a two-thirds vote of the membership in each house of the Legislature, *relevant evidence shall not be excluded* in any criminal proceeding, including pretrial and post conviction motions and hearings . . . ." (Italics added.)

faith on a warrant issued by a detached and neutral magistrate that subsequently is determined to be invalid. The good faith inquiry ". . . is confined to the objectively ascertainable question whether a reasonably well-trained officer would have known that the search was illegal despite the magistrate's authorization. In making this determination, all of the circumstances—including whether the warrant application had previously been rejected by a different magistrate—may be considered." (*Id.* at pp. 923-924, fn. 23 [82 L.Ed.2d at p. 698, 104 S.Ct. at p. 3421].)

"The Supreme Court reached this holding after balancing the cost, release of criminals, against the benefit, deterrence of unlawful official conduct, of the exclusionary rule. . . . In the court's terms: '"[A]ny rule of evidence that denies the jury access to clearly probative and reliable evidence must bear a heavy burden of justification, and must be carefully limited to the circumstances in which it will pay its way by deterring official lawlessness." (*Illinois* v. *Gates* [1983] 462 U.S. [213, 257-258] [76 L.Ed.2d 527, 103 S.Ct. 2317] (White, J., concurring in the judgment).) Because we find that the [exclusionary] rule can have no substantial deterrent effect in the sorts of situations under consideration in this case, . . . we conclude that it cannot pay its way in those situations.' ([*United States* v. *Leon, supra,*] 468 U.S. at [p. 908] [82 L.Ed.2d at pp. 688-689, fn. 6].)" (*People* v. *Barbarick, supra,* 168 Cal.App.3d at pp. 738-739.)

The *Leon* court described several hypothetical situations in which an officer's conduct would be so devoid of good faith as to justify the application of an exclusionary rule. "Suppression therefore remains an appropriate remedy if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth. [Citation.] The exception [of good faith] will also not apply in cases where the issuing magistrate wholly abandoned his judicial role . . .; in such circumstances, no reasonably well-trained officer should rely on the warrant. Nor would an officer manifest objective good faith in relying on a warrant based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.' [Citations.] Finally, depending on the circumstances of the particular case, a warrant may be so facially deficient—*i.e.,* in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid." (*Id.* at p. 923 [82 L.Ed.2d at pp. 698-699, 104 S.Ct. at pp. 3421-3422].)

In the case at bench we conclude the trial court correctly found the officers acted in good faith under the *Leon* standard. It was not objectively unreasonable for the police executing the search warrant to rely on the magistrate's

conclusion that nighttime service was necessary to preserve the evidence of defendant's crimes. The police did not mislead the magistrate in presenting the facts they believed amounted to exigent circumstances in respect to preservation of important evidence.

Defendant's mother had been told that her son was in custody under suspicion of robbery and that the police wanted to search for evidence of that crime. After receiving this information, defendant's mother drove directly to a telephone booth and was observed by the police when she called her daughter. When Mrs. Swan, her daughter, her son-in-law and her grandchildren entered the residence, it was not unreasonable for the police to fear the family might engage in an attempt to destroy or conceal any unfamiliar valuables or other evidence of wrongdoing they could locate in defendant's room. Detective Soltz testified both defendant's mother and her daughter were agitated and confrontational in declaring their intention to enter the residence. Though there may have been no evidence to support a fear defendant might call his mother and instruct her to destroy or conceal the evidence, the police's observations of defendant's mother and her conduct made it reasonable for them to fear she might instigate such an effort on her own. Moreover, as noted early on, the mother's right of privacy had already been partially surrendered voluntarily and the statutory purpose of avoiding sudden confrontational episodes attendant on nighttime service was here largely satisfied.

Viewing the entirety of the circumstances, therefore, we affirm the court's determination that the improper authorization for nighttime service was relied upon in good faith by the executing officers. Defendant's section 1538.5 motion to suppress the evidence seized was providently denied.

## 2. *Sentence*

Defendant contends his 65-year sentence negotiated in a plea bargain constituted cruel and unusual punishment and that a 50-year term was the maximum sentence allowable which would have been constitutionally proportional to his culpability. The contention is meritless.

Discussing a similar contention in a recent case, we stated: "We have some doubt of the propriety of reviewing the proportionality issue in a case where the defendant's sentence resulted from a freely negotiated plea bargain in which he was fully informed of the sentencing alternatives." (*People* v. *Rose* (1986) 182 Cal.App.3d 813, 818 [227 Cal.Rptr. 570].) As in *Rose* the record indicates defendant carefully considered the possible outcomes in the criminal prosecution against him. Further, he acknowledged during the hearing that his maximum sentencing exposure for the crimes charged was

between 105 and 125 years. During the sentencing hearing the trial court adequately assured itself defendant had been sufficiently advised about his options.

"As the party facing [a] plethora of criminal liability defendant was in a vastly better position to evaluate the proportionality between the sentence he bargained for and his actual culpability for the numerous offenses charged than we as an appellate court reviewing the paper record of the sentence received under the plea bargain agreement. If defendant believed the sentence required by law . . . was too severe or that a lighter sentence was probable were a jury to determine the extent of his guilt, he should not have entered the plea bargain." (*People* v. *Rose, supra,* 182 Cal.App.3d at p. 818.)

Defendant's argument that 50 years was the maximum sentence allowable under constitutional proscriptions against cruel and unusual punishment is not legally supported in his brief or elsewhere. The 65-year sentence agreed to by defendant appears in all respects justified. When viewed in light of the egregious and violent crimes of which defendant admitted his guilt, the 65-year sentence in no way ". . . shocks the conscience and offends fundamental notions of human dignity." (*In re Lynch* (1972) 8 Cal.3d 410, 424, fn. omitted [105 Cal.Rptr. 217, 503 P.2d 921].)

### *Disposition*

Judgment affirmed.

McDaniel, J., and Rickles, J., concurred.